512 So.2d 1192 (1987)
Marian R. FONTENOT, et al.
v.
Jeoffrey J. BOEHM, et al.
No. 85 CA 1457.
Court of Appeal of Louisiana, First Circuit.
July 8, 1987.
William Reinhardt, Jr., Metairie, for plaintiffs-appellants.
Edward Lobman, Metairie, for defendants-appellees.
Before LOTTINGER, SHORTESS, CARTER, SAVOIE and LeBLANC, JJ.
SHORTESS, Judge.
Marian Rousset Fontenot (plaintiff) and her husband James Fontenot brought suit against Jeoffrey J. Boehm (Boehm) and his mother Evelyn C. McGee and Evelyn C. McGee, Inc.,[1] for damages resulting from an automobile accident. State Farm Mutual Automobile Insurance Company was also joined as a defendant. It provided liability insurance for the Boehm vehicle and underinsured motorist coverage for the Fontenot *1193 vehicle. On April 17, 1982, plaintiff was driving her 1981 Pontiac Firebird and proceeding in a westerly direction on U.S. Highway 190, a two-lane, east-west highway in Mandeville. Boehm was driving a 1980 Ford half-ton truck equipped with oversized tires and was also proceeding in a westerly direction on U.S. 190, behind plaintiff. Plaintiff's infant daughter and babysitter were passengers in her car, and she had just stopped at the intersection of U.S. 190 and Carondelet, where she intended to make a left turn to go to her home. While stopped with her left turn indicator on, plaintiff's vehicle was struck violently in the rear by Boehm's truck. Considerable property damage was done to her Pontiac.
The Fontenots brought suit for their damages. After a trial by jury, their suit was dismissed, and they have brought this devolutive appeal.
LIABILITY
Four witnesses testified on the liability aspect of the case. Mario Arthur, assistant chief of the Mandeville Police Department, was proceeding in an easterly direction on U.S. 190 and was approximately five car lengths away from its intersection with Carondelet when he saw plaintiff's vehicle stopped with its left turn indicator on. He did not see the collision but heard the impact several seconds after he first saw plaintiff's vehicle. He saw no vehicle pass on plaintiff's right immediately before the accident, but after the accident he saw Boehm's truck pass on the right and proceed in a westerly direction. He put out a radio alert to look for the vehicle and testified that Boehm returned within several minutes thereafter.
Thomas Breazeale, a sergeant with the Mandeville Police Department, investigated this accident and prepared the accident report. He had been advised by radio that a brown pickup truck had left the scene, and he intercepted it and directed Boehm to return to the scene. Boehm told Breazeale that he was travelling west on U.S. 190 behind a blue Volkswagen van; that the van veered onto the shoulder, and he saw plaintiff apparently making a left turn; that he tried to stop but could not and hit her. Breazeale noted heavy damage across the entire rear end of plaintiff's vehicle. He also noted that there was a moderately heavy rain at the time of the accident.
Plaintiff testified that she was proceeding west on U.S. 190 and was going to make a left turn at Carondelet when a truck rammed into the back of her car; that she had her left turn indicator on and was going "real slow," between one and five miles per hour, but had not actually stopped; that U.S. 190 is the main commercial street through Mandeville and she traveled it every day; that there are many intersecting streets and motorists had to stop constantly for vehicles making left and right turns; that it was raining; that the impact pushed her car forward about fifteen feet; that after the impact she looked in her rear-view mirror, saw a tan or brown truck with high wheels, much higher than her car; that she saw a blue van come from behind the truck that had hit her and pass on the right; and that the truck that hit her left the scene. On cross-examination, plaintiff admitted she did not remember whether she told Boehm to go after the van.
Boehm testified that he was going west on U.S. 190 in his Ford pickup truck which was equipped with oversized tires; that traffic was busy; that a blue Volkswagen van was in front of him; that it was narrow and tall; that he followed the van all the way through town; that he was going between 30 and 35 miles per hour; that it was raining very heavily; that he saw the driver of the van hit his brakes "kind of hard" and it slid off to the side of the road; that he looked up, saw plaintiff stopped with her blinker on; that he hit his brakes but the road was very wet at the time; that he could not take to the shoulder because the van was there and there was oncoming traffic; that he had not seen plaintiff's vehicle before the van moved; that when he applied his brakes his truck started sliding and he slid into her vehicle, the front of his truck hitting the back of her car; that he estimated he was going 20 miles an hour at the time of the collision; that after the *1194 collision plaintiff's vehicle was about four feet in front of him; that he started pulling off to the side of the road when plaintiff got out of her car and yelled for him to catch the van; that he went after the van but could not find it and returned to the scene of the accident. On cross-examination, Boehm admitted that he traveled this stretch of highway two or three times a week and knew that there were many intersecting streets where motorists turned left or right off the highway, and that he surmised that the blue van was probably passing to plaintiff's right at the time he collided with her vehicle.
The primary thrust of plaintiffs' appeal is that the trial court erred in improperly charging the jury. The portion of the charge plaintiffs' find most egregious we quote as follows:
The driver of a following vehicle must be alert to the actions of motorists preceding him on the highway. When a rear-end collision occurs, the driver of the following vehicle is generally presumed to be negligent. However, the driver will be exonerated where he can reasonably explain the cause of his running into the vehicle ahead.
A driver confronted by a sudden emergency or danger not of his own making and to which he did not contribute is not responsible for error in judgment committed by him in the [face] of this emergency. When faced with sudden peril, not of one's own making, one is bound to exercise only that caution and judgment which we would reasonably expect from an ordinarily prudent person under the same circumstances.
This ordinary prudent person, although he need not act in a calm, cool and collected manner, or [choose] the wisest [course] of conduct, is one who exercises reasonable care under the circumstances.
The jury returned a general verdict which said simply, "We, the jury, find for the defendants." The conclusion is inescapable that it exonerated Boehm from fault because it applied the sudden emergency doctrine to him. Under the facts of this case, we find that the trial court was clearly wrong in giving its charge because of the evidence which the jury had before it. We dealt with the sudden emergency doctrine in Welch v. Thomas, 263 So.2d 427 (La.App. 1st Cir.1972), writ denied, 262 La. 1132, 266 So.2d 434 (1972) and discussed an exception to the general rule that a following motorist is presumed negligent if he collides with the rear of a leading vehicle; i.e., when a following motorist is suddenly confronted with an unanticipated hazard created by a forward vehicle, which could not be reasonably avoided, the following driver would be adjudged free from fault. Plaintiff was guilty of no fault. She slowed her vehicle, turned on her left turn indicator and prepared for a legal left turn. Any unanticipated hazard would have been created by the driver of the blue van, not by plaintiff.
It is the unanticipated hazard which forms the foundation for sudden emergency, like a dog darting into the road, Whitehead v. Cruse, 279 So.2d 802 (La.App. 2d Cir.), writ denied, 281 So.2d 756 (La.1973), or a child falling from a Volkswagen bus. Murray v. Volkswagen Mid-American, Inc., 297 So.2d 236 (La.App. 3d Cir.1974). Here, while Boehm might not have expected the van to swerve, he knew that he was traveling on a heavily traveled commercial highway; that cars stopped frequently to turn left and right; that it was raining; that his speed was between 30 and 35 miles per hour. Yet he did nothing in anticipation of having to stop in a line of traffic for a vehicle such as plaintiff's, which was making a left turn. The most telling admission from Boehm is that as the blue van slid off to the side of the road he looked up and saw plaintiff was "dead stopped." Boehm was negligent in failing to keep a proper lookout, following too closely, and driving too fast for existing conditions.
As a result, Boehm cannot invoke the sudden emergency doctrine to defend himself. "The sudden emergency doctrine is no defense to a charge of negligence where the emergency was created by a motorist's lack of lookout, speed, [or] ... following another vehicle too closely." 2 Blashfield, *1195 Automobile Law and Practice § 102.28 (Revised Third Edition 1979) (footnotes omitted). Our courts are in accord with this statement of the law. In Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir.1974), the court refused to apply the doctrine because the defendant failed to maintain a proper lookout. In Breaux v. Roy Young, Inc., 397 So.2d 1384 (La.App. 3d Cir.1981), the defendant was found to have been following the preceding vehicle so closely that he was unable to bring his vehicle to a safe stop; therefore, the court ruled that the emergency was caused by the defendant and that he could not avail himself of the sudden emergency doctrine. We have held that a motorist who was driving too fast for the conditions could not benefit from this defense. Dudley v. State Farm Mutual Automobile Insurance Co., 255 So.2d 462 (La.App. 1st Cir.1971).
The genesis of these rules is this principle:
The rule of sudden emergency cannot be invoked by one who has brought that emergency on himself by his own wrong or who has not used due care to avoid it. The sudden emergency doctrine is applicable to the standard of conduct of a motorist after an emergency has arisen, it does not apply to lower the standard of care required of motorists before the emergency occurs. 2 Blashfield, Automobile Law and Practice § 102.28 (3rd ed. 1965). See also Noland v. Liberty Mutual Insurance Company, 232 La. 569, 94 So.2d 671 (1957).
Dick v. Phillips, 218 So.2d 299, 302 (La. 1969). (Emphasis supplied.) The defect in the sudden emergency charge given by the trial court is that it did not instruct the jury as to when the doctrine is applicable to exonerate a defendant.
The improper instruction allowed the jury to mistakenly apply the sudden emergency doctrine to Boehm's actions before he realized plaintiff's vehicle was stopped in his lane. In fact, Boehm proved only that the blue van existed, and the jury exculpated him from negligence. In effect, the mistaken jury charge denied plaintiff the benefit of the presumption that a following driver is negligent if he collides with a leading vehicle. The rear-end collision was admitted; therefore, the presumption attached, transferring the burden to Boehm to prove that his conduct was reasonable and not negligent prior to the time the blue van swerved. As we demonstrated above, he did not sustain that burden.
For the reasons stated, we find that Boehm's negligence was a substantial and unexcused factor in causing plaintiffs' damages and that the trier of fact was clearly wrong in dismissing plaintiffs' suit.
QUANTUM
At the time of the accident, plaintiff was a professional dance instructor who owned her own dance studio. She conducted adult exercise classes in the mornings and evenings and taught children's classes in the afternoons during the school year. She had owned the Marian Fontenot School of Dance for eleven years, and this accident had an immediate impact upon her business. She complained of pain immediately after the accident and was taken to the emergency room of the St. Tammany Parish Hospital where she was seen by Dr. Gerald Keller, her family physician and next-door neighbor. In his examination, Dr. Keller noted tenderness and considerable spasm of the cervical musculature, left shoulder, and left trapezius musculature. His diagnosis was left trapezius and left cervical strain. His treatment consisted of physical therapy, muscle relaxants, and pain medication. He also told plaintiff to stay quiet and not participate in dance instruction or any physical activity. On April 26, because of her persistent complaints and continued symptoms, he told her that she should not teach her June or July exercise classes and should cancel her dance and exercise classes for the summer. He also told her not to dance in her scheduled May dance review.
Dr. Keller first noted complaints of headaches on April 26, accompanied by nausea and vomiting. He placed plaintiff on mild tranquilizers in May because she was upset and anxious over her lack of improvement. He continued to see her and noted in October and November that she continued to *1196 have spasms and tenderness. In October, he referred her to a physical therapy clinic. Her complaints of pain and her depression persisted. Her anxiety over her inability to resume her full activities as a dance instructor aggravated her condition. By January 12, 1983, he found no spasm.
Dr. Keller felt that her injuries were permanent and that she would have permanent pain and soreness when she pushed herself into any type of full activities such as bending, flexing, turning her head, and making quick movements. He quantitated her disability at 10%.
Dr. Keller, because of her continuing persistent complaints, referred plaintiff to Dr. Luis Matta, an orthopedic surgeon on January 13, 1983. Dr. Matta saw plaintiff one time. His x-rays were essentially negative except for a subluxation between C-4 and C-5. Dr. Matta was of the opinion that plaintiff should learn to cope with this anomoly but that normal flexion and extension mechanisms could aggravate her condition which would cause pain in the neck, upper back, and shoulders. He felt plaintiff had a 5% permanent partial disability to the neck, secondary to injury. He also felt that plaintiff, as a dance instructor, would have to find out what movements caused discomfort and pain and adjust accordingly. On cross-examination, Dr. Matta agreed that his examination was essentially negative; that there were no objective signs of residual injury; and that the subluxation was mainly secondary to her profession as a dancer, rather than traumatic in origin. He felt that further diagnostic testing was unnecessary and that plaintiff could live with her problem.
Dr. Russell C. Grunsten, an orthopedic surgeon, also saw plaintiff at State Farm's request. He put plaintiff through a battery of tests and felt that her reactions to several of his tests were manipulated. He could find nothing objectively wrong with her.
Plaintiff testified that she cancelled her 1982 summer session, did not dance in her review, and was forced to seriously curtail not only her professional dancing regimen but also her household duties, which caused her great anxiety. She did not teach at all for the first 45 days after the accident. She gradually began teaching again but could no longer demonstrate many techniques. Her dance school remained closed until September of 1982 when she reopened it and hired a teacher to assist with the demonstrations. She was required to pay the teacher's salary which was an additional expense to her. She gradually increased her activities and did dance in her dance review in the spring of 1983, but it was a simple ballet and she experienced pain for two weeks after the review because of her participation. She admitted that by the spring of 1984 she noticed increased improvement with many fewer headaches, but she complained that even to the date of trial there were many moves she could not perform in the adult classes. She has taught no summer schools since the accident.
James Fontenot seeks to recover for loss of consortium. He testified that there was a complete change in plaintiff after the date of the accident because she was depressed, did not handle the baby like she used to, did not cook, and cancelled her dance review. He said that when she was not in pain she was depressed. He estimated that this condition lasted for over a year but that some things still persist, such as not lifting the baby, having a problem with groceries, and taking clothes from the washing machine to the dryer.
We have examined plaintiff's extensive list of special expenses and allow recovery for the following:

1. Julie Glockner (substitute instructor,
1982) $ 620.00
2. 1982 summer school session 266.57
expenses
3. invitations for May 1982 dance review
which was cancelled 438.70
4. 1982 dance review expenses 472.44
5. baby care expenses 260.00
6. car rental expenses 1,302.00
7. Julie Glockner (substitute instructor,
1983 and 1984) 2,521.64
8. medical expenses 932.38
 ________
 TOTAL $6,813.73

Additionally, we fix general damages to plaintiff for pain and suffering, physical impairment, earning loss, and disability at *1197 $50,000.00. We award James Fontenot the sum of $5,000.00 for loss of consortium. Costs are taxed to defendants.
REVERSED AND RENDERED.
LOTTINGER, J., dissents.
NOTES
[1] Evelyn C. McGee was dismissed as a party defendant after her son became of age, and a stipulation was entered into at the time of trial that the vehicle Boehm was operating was owned by Evelyn C. McGee, Inc., and that Boehm was operating it with permission at that time.