633 So.2d 197 (1993)
Hung Chi "Tim" LY, et al.
v.
STATE of Louisiana, Through The DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONSLouisiana State Police, and Glynn Delatte.
No. CA 92 1054R.
Court of Appeal of Louisiana, First Circuit.
November 24, 1993.
Writ Denied February 25, 1994.
*199 Richard Dodson, and John Tyler, Baton Rouge, for plaintiff-appellant Hung Chi "Tim" Ly CNB, tutor for minor children.
Samuel Cicero, Stacey Moak, Baton Rouge, C.T. Williams, Jr., J. Elliott Baker, Metairie, for defendant-appellant State Dept. of Public Safety and Corrections, State Police and Glynn Delatte.
Before CARTER, GONZALES and WHIPPLE, JJ.
WHIPPLE, Judge.
This suit arises out of a vehicular collision which resulted in the deaths of Phat Duong and his wife, Ha Xu Ly. Plaintiffs herein are Hung Chi "Tim" Ly, the major son of the decedents, and City National Bank, as tutor of the property of the decedents' minor children, Oanh Duong, Nga Duong, Chau Duong, Quy Duong and John Duong. The trial court rendered judgment in favor of plaintiffs and against defendants, Glynn Delatte and the State of Louisiana through the Department of Public Safety and CorrectionsLouisiana State Police ("the State Police"). From this judgment, plaintiffs and defendants appeal. For the following reasons, we affirm in part and amend in part.

FACTS AND PROCEDURAL HISTORY
The accident occurred on August 14, 1990, at approximately 5:10 a.m., on Interstate 10 in Baton Rouge, Louisiana. This portion of I-10 is a three-lane interstate with a one percent upgrade or incline. At the time of the accident, it was dark outside, but this section of I-10 was lit by continuous street lights. The posted maximum speed limit on the portion of I-10 involved in this accident is fifty-five miles per hour. Decedents' 1983 Chevrolet Malibu was stalled in the eastbound center lane of travel. It was later determined that the Duong vehicle had a faulty ignition coil which, when moved or vibrated slightly, could cause the car to stall. Decedents had purchased this vehicle about one week prior to the accident and were not aware of the defect.
Louisiana State Trooper Glynn Delatte was on duty at the time of the collision. He had begun a twelve hour shift at 6:30 p.m. on the evening of August 13, 1990. At approximately 5:00 a.m. on August 14, 1990, as he neared the end of his shift, Trooper Delatte was driving to the east bank of the Mississippi River in his 1989 Chevrolet Caprice trooper's vehicle, headed either to the troop headquarters or his home. As he traveled eastbound on I-10, Delatte moved into the center lane of travel behind a vehicle driven by Ronnie Andrus.
According to Trooper Delatte, he was traveling a distance of approximately 100 feet or *200 eight or nine car lengths behind the Andrus vehicle when he observed the Andrus vehicle swerve to the right. Delatte testified that his immediate reaction was to focus on what the Andrus vehicle was doing. Delatte stated he then saw an object in his lane of travel and immediately swerved to the left. After moving his vehicle to the left, he applied his brakes and began to skid approximately thirty-nine feet from the decedents' vehicle. The front right half of Delatte's vehicle eventually collided with the rear left half of the Duong vehicle. The parties stipulated that Trooper Delatte was driving at a rate of speed in excess of the legal maximum allowed at this portion of the interstate.
Delatte's vehicle veered to the left after colliding with decedents' vehicle, striking and riding up onto the left retaining wall of I-10. His vehicle traveled 162 feet on the retaining wall before coming to rest. Delatte suffered only minor injuries.
After the initial impact, the decedents' vehicle was propelled into the right retaining wall. At some point after the initial collision, the Duong vehicle burst into flames and was completely consumed. Ha Xu Ly was seated in the driver's seat at the time of the collision, and was pronounced dead at the scene. At the time of the impact, her husband, Phat Duong, was not in the car.
Duong had been standing on the driver's side of the Duong vehicle, and was thrown approximately 149 feet as a result of the collision. Duong suffered a traumatic amputation of one of his legs and underwent numerous surgeries in the two weeks following the accident. However, on the fourteenth day after the collision, Phat Duong died while hospitalized in the Intensive Care Unit at Baton Rouge General Hospital.
On October 16, 1990, suit was filed by Hung Chi "Tim" Ly, individually (as the major child of the decedents) and as representative of the estate of decedents, and City National Bank of Baton Rouge, as tutor of the decedents' five minor children, against Delatte and his employer, the State Police. On August 1, 1991, defendants filed a third party demand against General Motors Corporation, the manufacturer of the Duong vehicle, alleging that a design defect caused the vehicle to ignite. Because the trial date had already been set, the trial court, upon motion of plaintiffs, severed the trial of the third party demand from the trial of the principal demand.
After a four-day bench trial of the principal demand, the trial court concluded that both the decedents and Trooper Delatte were negligent and apportioned fault at two-thirds to the decedents and one-third to Trooper Delatte. The court also awarded several categories of damages to the plaintiffs. The court awarded $200,000.00 for the survival action of Phat Duong, consisting of $150,000.00 for pain and suffering, $25,000.00 for loss of love, affection and consortium for the death of his wife, and $25,000.00 for loss of future income. The court also awarded plaintiffs $55,645.70 for medical expenses incurred by Phat Duong prior to his death.
The court awarded $125,000.00 for the survival action of Ha Xu Ly, consisting of $50,000.00 for pain and suffering prior to death, and $75,000.00 for loss of future income. The court further awarded $325,000.00 to plaintiff, Hung Chi "Tim" Ly, consisting of $225,000.00 for loss of love and affection from his mother, and $100,000.00 for loss of love and affection from his father; $525,000.00 for each of the five minor children, consisting of $300,000.00 for each child for loss of love and affection from their mother, and $225,000.00 for each child for loss of love and affection from their father. These damages totalled $3,330,645.70, for which defendants were held liable for one-third.
The trial court further held that LSA-R.S. 13:5112, which limits pre-judgment interest on personal injury and death claims against the State, is unconstitutional.
From this judgment, plaintiffs and defendants appealed. Defendants then moved to transfer this appeal directly to the Louisiana Supreme Court pursuant to Article 5, section 5(D)(1) of the Louisiana Constitution. The motion to transfer was granted by this court. However, the Supreme Court remanded the case to this court for a decision on all issues other than the issue of the constitutionality of LSA-R.S. 13:5112(C), holding its decision on the constitutionality issue in abeyance, *201 pending our decision on the other issues presented in the appeals.
On appeal, plaintiffs contend the trial court erred in finding that decedents were two-thirds at fault in causing the accident. Defendants assert that the trial court erred: (1) in finding Trooper Delatte at fault in causing the accident, (2) in its interpretation of the limitation on judgments in suits against the State as set forth in LSA-R.S. 13:5106, (3) in fixing the amount of damages, and (4) in declaring LSA-R.S. 13:5112 unconstitutional.

FAULT OF THE PARTIES

(Plaintiffs' Assignment of Error No. 1; Defendants' Assignment of Error No. 1)
Plaintiffs argue that Trooper Delatte's negligence was the sole legal cause of the rear-end collision and that the trial court accordingly erred in assigning any fault to the decedents. Defendants, on the other hand, argue that the trial court erred in assigning any fault to Trooper Delatte. Before reviewing the trial court's apportionment of fault between the parties, we must first examine the actions of each party to determine whether the trial court erred in finding them negligent.
As set forth in LSA-R.S. 32:81, Trooper Delatte had a duty not to follow another vehicle more closely than was reasonable and prudent, having due regard for the speed of the vehicle and the traffic upon and the condition of the highway. As Louisiana courts have uniformly held, a following motorist in a rear-end collision is presumed to have breached this duty, and hence, is presumed negligent. Mart v. Hill, 505 So.2d 1120, 1123 (La.1987). However, under the sudden emergency doctrine, there is an exception to the general rule that a following motorist is presumed negligent if he collides with the rear of a leading vehicle. This doctrine provides that a following motorist will be adjudged free from fault if the following motorist is suddenly confronted with an unanticipated hazard created by a forward vehicle, which could not be reasonably avoided, unless the emergency is brought about by his own negligence. Fontenot v. Boehm, 512 So.2d 1192, 1194 (La.App. 1st Cir.1987).
In addition to the duty to follow at a reasonable and prudent distance, a motorist also has a duty to maintain a careful lookout, observe any obstructions present, and exercise care to avoid them. McIntyre v. Saunders, 554 So.2d 1371, 1373 (La.App. 1st Cir. 1989), writ denied, 558 So.2d 583 (La.1990); Prest v. State Department of Transportation, 490 So.2d 659, 662 (La.App. 2nd Cir.), writ denied, 494 So.2d 328 (La.1986). Finally, Trooper Delatte had a duty not to exceed the speed limit of fifty-five miles per hour. Prest, 490 So.2d at 662.
Delatte testified that he was following about 100 feet or eight or nine car lengths behind the Andrus vehicle in the center lane of travel, and did not see decedents' vehicle until the Andrus vehicle changed lanes to avoid the stalled car. Defendants argue in brief that Delatte should be exonerated from fault because his ability to see the stalled vehicle was obstructed by the Andrus vehicle which he was following. To the contrary, however, when a preceding vehicle is obstructing a motorist's view ahead, the motorist has a duty to leave sufficient space between himself and the preceding vehicle to stop in case of an unexpected hazard in the road ahead. Matthews v. Diversified Services, Inc., 540 So.2d 603, 605 (La.App. 5th Cir.1989); see Prothro v. Dillahunty, 488 So.2d 1163, 1167 (La.App. 2nd Cir.1986). As the trial court properly concluded, Trooper Delatte did not do so and thus, breached his duties to follow at a reasonable and prudent distance and to maintain a careful lookout ahead. Therefore, Delatte is partially at fault in causing a situation from which he could not safely extricate his vehicle when confronted by the decedents' stalled vehicle.
Moreover, the parties stipulated that prior to the collision, Trooper Delatte was traveling in excess of the posted speed limit. Conflicting opinions were given regarding Delatte's actual speed. The investigating officer, State Trooper John Futral, Jr., was accepted by the court as an expert in accident reconstruction and calculated Delatte's speed prior to braking as 59.6 to 67.8 miles per *202 hour. Raymond McHenry, defendants' accident reconstruction expert, calculated Delatte's speed to be 57 miles per hour, plus or minus 5 miles per hour. Professor Andrew McPhate, plaintiffs' accident reconstruction expert, concluded that Delatte was traveling 64 to 69.6 miles per hour prior to braking. After considering these conflicting opinions, the trial court found as a fact that Delatte "was traveling probably 57 to the low 60's." Thus, Delatte was clearly exceeding the posted speed limit at the time of the accident.
Had Trooper Delatte been traveling at a slower rate of speed, maintaining a proper lookout, and not following so closely behind the Andrus vehicle, he would have had a greater opportunity to observe the stalled vehicle and to take action to avoid the collision. Thus, the trial court's conclusion that Delatte was partially at fault in causing the accident was not manifestly erroneous and will not be disturbed on appeal.
Turning to an analysis of decedents' conduct, we must agree with the trial court that decedents' conduct also contributed to the accident. A motorist disabled on a highway has a statutory duty to remove his vehicle as soon as possible and to protect traffic until the vehicle is removed. LSA-R.S. 32:141(B). Moreover, these duties must be undertaken in a reasonable manner. Rose v. State Farm Mutual Automobile Ins. Co., 468 So.2d 833, 836 (La.App. 1st Cir.), writ denied, 474 So.2d 1307 (La.1985).
At trial, there was conflicting evidence as to whether decedents had their four-way emergency flashers or headlights on. Alex Sibley was traveling eastbound on I-10 on the morning in question and was the first witness to observe the decedents' disabled vehicle. Sibley testified that the emergency flashers, headlights and taillights were not lit on decedents' vehicle, making it difficult to observe the vehicle, which he stated "blend[ed] with the surroundings." Sibley swerved to the right and barely missed hitting the stalled vehicle. Sibley also testified that while he observed a man standing outside the vehicle, the man was not attempting to flag or signal oncoming vehicles to warn of the stalled vehicle.
Contrariwise, Loyton Miller, a truck driver, also observed decedents' stalled vehicle that morning as he traveled eastbound on I-10 and testified that at the time he saw the decedents' vehicle, the taillights and emergency flashers were on. Loyton also testified that at the time he passed the vehicle, the two individuals he saw standing outside the vehicle were not attempting to warn traffic.
Lyle Trahan, a truck driver traveling westbound on I-10, also saw decedents' vehicle immediately before the collision. Trahan testified that he observed that the four-way emergency flashers on decedents' vehicle were operating, but the headlights were not on. Trahan observed a woman seated in the driver's seat and a man standing behind the vehicle, whom he thought was either trying to push the vehicle or signal to traffic.
However, Ronnie Andrus, the individual whose vehicle was traveling directly in front of Trooper Delatte, testified that he did not observe any taillights or emergency flashers as he approached decedents' vehicle. Andrus stated that after passing the Duong vehicle, he also looked in his rearview mirror and did not observe any headlights. Trooper Delatte testified similarly that he did not notice any lights of any kind on the stalled vehicle.
Eric Jackson, an electrical engineer, examined remnants of the bulbs of decedents' vehicle to determine whether the lights were on or off at the time of the collision. Jackson testified that the bulb of the right front flasher exhibited symptoms of being red hot and glowing at the time the Duong vehicle impacted with the right retaining wall. Jackson's examination of the bulb of the left front flasher also indicated that perhaps it was glowing, but Jackson could not be certain. The rear of the vehicle was totally destroyed, preventing complete testing of the rear bulbs by Jackson. While his analysis indicated that the four-way emergency flashers were on, Jackson opined that the headlights were not on. In addition to examining the bulbs of the headlights, Jackson also examined the remnants of the light switch which controlled the headlights, taillights and parking lights. Jackson concluded that the switch was in the *203 "off" position when the vehicle was consumed by fire.
After hearing all of the testimony, the trial court concluded that at the time of the collision, the Duong vehicle's four-way emergency flashers were on, but the headlights and taillights were not.
The evidence presented at trial shows that at the time of the accident, it was dark outside, although this portion of I-10 was lit by street lights. As the record shows, while the decedents may have turned off the headlights of their vehicle in an attempt to restart their vehicle, this action was not reasonable considering the lighting conditions outside, the color of the vehicle (which witnesses described as blending with the surroundings), and the extremely dangerous nature of the situation.
Moreover, as the trial court concluded, the decedents' repeated attempts to restart their vehicle over an extended period of time was not a reasonable exercise of their duties. Extensive evidence was adduced at trial regarding the length of time that the Duong vehicle was stalled prior to the collision. Sibley specifically recalled passing through this area of I-10 at approximately 5:00 a.m., because he remembered listening to the 5:00 a.m. news on the radio. Loyton Miller, a truck driver, testified that he observed the decedents' stalled vehicle at approximately 5:15 or 5:20 a.m. Trooper Delatte testified that shortly before the accident, he checked his watch, and noted that the time was 5:12 a.m. In the traffic homicide investigation report, the time of the accident was estimated to be 5:10 a.m.
After determining that the decedents' vehicle had been stalled for at least ten minutes before the accident, the trial court concluded that the decedents "had been at the vehicle long enough to decide that [they] weren't going to start it. They should have abandoned the vehicle, and they left themselves in a position where they werethis was certain to happen, and I really regret that."
As noted by this court in Rose, a disabled motorist has more reasonable alternatives than attempting to personally remove the disabled vehicle in an unreasonably dangerous situation. The decedents could have attempted to flag down a motorist to request assistance or to send the motorist for assistance. The decedents could have gone for assistance themselves, or could have directed traffic until the eventual arrival of assistance. Rose, 468 So.2d at 836-837. Instead, the decedents attempted repeatedly to start the vehicle, with only the four-way emergency flashers lit. Considering the record in its entirety, we find no error by the trial court in its determination that the decedents did not discharge their duties in a reasonable manner and thus, were also partially at fault in causing the accident.

APPORTIONMENT OF FAULT

(Plaintiffs' Assignment of Error No. 1; Defendants' Assignment of Error No. 1)
The trial court found decedents two-thirds at fault and Trooper Delatte one-third at fault. Plaintiffs contend the assessment of fault to their parents is too high; defendants contend the assessment of fault to the decedents is too low.
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La. 1985), the Louisiana Supreme Court set forth five factors to be considered in apportioning fault: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) the extent of the risk created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
A determination by the trier of fact as to allocations of fault is a factual finding which can not be overturned in the absence of manifest error. Particularly where there is conflicting testimony, the trier of fact's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed. McIntyre, 554 So.2d at 1373. In reviewing the trial court's factual findings, this court employs a manifest-error, clearly wrong standard. This court may not overturn a factual finding of the trial court unless *204 we find: (1) a reasonable factual basis for the trial court's finding does not exist in the record, and (2) the record establishes that the finding is clearly wrong. The issue to be resolved by this court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Thus, if the trial court's findings are reasonable in light of the record, we may not reverse the trial court's findings even if convinced that, had we been sitting as the trier of fact, we would have weighed the evidence differently. Stobart, 617 So.2d at 882-883.
Although Trooper Delatte was not following the Andrus vehicle at a reasonable distance as discussed above, the trial court concluded that Delatte was following the "two-second rule," which, in his training, he thought was a safe following distance. The "two-second rule" provides that a motorist should maintain at least a two second space cushion between himself and the preceding vehicle, regardless of speed. However, expert testimony at trial established that the average reaction time in this type of situation is 1½ seconds, thus leaving a motorist only one-half of a second to take evasive action under the two-second rule. As the trial court observed:
Trooper Delatte, following what he was taught was safe driving procedure by the State of Louisiana, is left in a position of peril of thinking, yes, I can stop at a safe distance and thinking I'm driving safely, when in fact he's set up for an accident to happen if there's a sudden emergency.
Delatte's reliance on the "two-second rule" decreased his awareness of the danger of following the Andrus vehicle so closely. However, as an experienced State Trooper, Delatte knew or should have known of the danger of speeding and failing to maintain a proper lookout ahead. Delatte was going to the troop headquarters or his home as he was nearing the end of his work shift, a shift on which he was "taking it easy." Thus, he had no justifiable reason to proceed in haste or without caution.
In contrast, the decedents were faced with an extremely difficult situation which may have required them to proceed in haste and without proper thought. However, their action in turning off the headlights, even in an attempt to start their vehicle, was highly unreasonable given the surrounding circumstances. The accident occurred before dawn, and the evidence presented at trial indicates that at least two other motorists who came upon decedents vehicle while the headlights were off came extremely close to colliding with the disabled vehicle.
Moreover, the testimony of Eric Jackson shows that if the car battery was in a weakened state, due to repeated and unsuccessful attempts to start the vehicle, the four-way emergency flashers may not have remained lit when the starter was engaged, because of the strain placed on the battery. As Jackson opined, decedents' battery may have been weakened to a point where the emergency flashers were rendered inoperative while the decedents were attempting to start the vehicle.
We find ample support in the record for the factual findings made by the trial court. As the trial court ultimately concluded, while the Duongs' stalled vehicle was not readily apparent at the time of the accident, it was discernable to a prudent motorist. Likewise, the record shows that the decedents had ample time to realize that they would not be able to restart their vehicle and should have taken other measures to protect oncoming traffic and themselves.
After weighing all of the factors involved in this accident, and applying the principles set forth in Watson, 469 So.2d at 974, we conclude that the trial court was not manifestly erroneous in its apportionment of fault.

DAMAGES

(Defendants' Assignment of Error No. 3)
Defendants also challenge several aspects of the quantum awarded by the lower court. Defendants argue that the trial court erred in awarding $50,000.00 for the pain and suffering of Ha Xu Ly prior to her death; in awarding $225,000.00 to each of the five minor children for the loss of their father and *205 $300,000.00 to each of the minor children for the loss of their mother; and in awarding $225,000.00 to Hung Chi "Tim" Ly for the loss of his mother and $100,000.00 for the loss of his father.
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury. LSA-C.C. 2324.1; Youn v. Maritime Overseas Corp, et al, 92-C-3017, 623 So.2d 1257 (La.1993). Before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its much discretion in making its award. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). The initial inquiry into whether the award is inadequate or excessive must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979).

Pain and Suffering of Ha Xu Ly
Defendants argue that there should be no award for the conscious pain and suffering of Ha Xu Ly, asserting that she died upon initial impact. A trial court is within its much discretion in awarding damages for pain and suffering where there is the smallest amount of evidence of pain on the part of the deceased by her actions or otherwise. Hampton v. Rubicon Chemicals, Inc., 579 So.2d 458, 469 (La.App. 1st Cir.1991).
Norris Deville, deputy coroner for East Baton Rouge Parish, examined the body of Ha Xu Ly after the accident and obtained blood samples for analysis. Deville, who has no formal medical education, determined from Ha Xu Ly's remains that her skull was intact. Deville testified that there was no extrinsic evidence of any blunt trauma to the body other than the fact that her intestines were exposed. Dr. Alfredo Suarez, a pathologist who testified at trial, explained that the increase in temperature in the vehicle probably played a significant part in causing the bursting of the abdominal viscera out of the abdominal wall. No autopsy was performed to determine the precise cause of death.
Deville discussed his findings with Dr. Hypolite Landry, the coroner, who then made a determination that Ly died instantaneously as a result of the collision and explosion. Because the results of the blood test indicated a low carbon monoxide level in Ly's remains, Dr. Landry concluded that Ly did not burn to death. Dr. Landry testified that he felt trauma had occurred at both points of impact, upon the initial collision and the subsequent collision with the retaining wall. However, when questioned by the court as to his opinion of whether Ly died as a result of the first collision or second collision, Dr. Landry stated that he could not ascertain which event caused her death.
Based on this testimony, the trial judge concluded that Ha Xu Ly did not burn to death, although the court stated it found such a conclusion "highly suspect" because of the absence of any trauma to Ly's body. The trial court further concluded that Ly survived from the time of the initial collision until the time the vehicle struck the retaining wall. Given the lack of a precise cause and time of death as well as the absence of trauma to the body, we are unable to say that the trial court was manifestly erroneous in finding Ha Xu Ly survived for the period of time between the initial and second collision. Moreover, considering the particular circumstances of this case, we find no abuse of discretion in the court's award of $50,000.00 for the pain and suffering endured by Ly before she ultimately died.

Children's Wrongful Death Claims
Defendants also challenge as excessive the awards for the loss of love and affection of their parents. "Tim," who was nineteen years old at the time of trial, was awarded $100,000.00 for the loss of his father and $225,000.00 for the loss of his mother. The five minor children, Oanh (who was thirteen years old at the time of trial); Nga, (eleven years old); Chau, (ten years old); Quy, (seven years old); and John, (four years old), were each awarded $225,000.00 for the *206 loss of their father and $300,000.00 for the loss of their mother.[1]
The facts of this case are especially tragic. The Duong family immigrated to the United States approximately four to five years before the accident. Only the youngest child, John, was born in the United States. Phat did not speak English, and Ha spoke very limited English. The evidence adduced at trial indicates that the family was very close-knit, undoubtedly due to the fact that they were of a different culture and had no relatives living in this state. The children are now being raised by an American couple.
Brandt Hardy, a therapist, had been counseling the children and opined that the children's loss is compounded by the fact that both parents died within a two-week span, and by the type of accident involved. Moreover, the tragedy and loss are exacerbated because the children are of a different culture.
We agree with the trial court that "the loss when you lose both parents should be greater per parent because when you have lost one parent, at least you have somebody else to sympathize and get through your grief with." Moreover, because the children are of a different culture, their feeling of separation was established at trial as being pronounced. While these awards may be on the high side, after considering the trauma sustained by these children as a result of the double loss they suffered in this single disaster, and considering their particular circumstances, we cannot conclude that the trial court abused its much discretion in making these awards.[2]

APPLICATION OF LSA-R.S. 13:5106

(Defendants' Assignment of Error No. 2)
Defendants contend that plaintiffs' general damage awards should be limited to a total of $500,000.00, pursuant to LSA-R.S. 13:5106. The trial court, in rendering its award, made no mention of the legal cap set forth in R.S. 13:5106 either in its reasons for judgment or in the judgment itself.
LSA-R.S. 13:5106 provides, in part, as follows:
B. (1) In any suit for personal injury [against the state, a state agency or political subdivision], the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars.
(2) In any suit for wrongful death, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings or loss of support, and loss of future support, as provided in this Section, shall not exceed five hundred thousand dollars.
The facts of this case present the court with personal injury claims (in the form of survival actions) for two tort victims, as well as wrongful death claims resulting from the deaths of the two victims.
LSA-C.C. art. 2315.1 addresses survival actions and provides that the surviving children of the deceased may bring an action against the tortfeasor to recover all damages for injury to the deceased caused by the offense or quasi-offense. The survival action permits recovery only for the damages suffered by the deceased from the time of the injury to the moment of death, including pain and suffering, loss of earnings and any other damages sustained by the victim before death. Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614, 618 (La.App. 1st Cir.), writ denied, 515 So.2d 1111, (La.1987). Because a survival action compensates for personal injuries suffered by the now-deceased tort victim, we find it falls under subsection (B)(1) of LSA-R.S. 13:5106 which pertains to "any suit for personal injury."
*207 In Chamberlain v. State Department of Transportation and Development, 93-C-0472, 624 So.2d 874 (La.1993), the Louisiana Supreme Court recently held that LSA-R.S. 13:5106(B)(1) conflicts with the Louisiana Constitution's prohibition against sovereign immunity from liability in contract or for injury to person or property, as expressed in LSA-Const. art. XII, § 10(A). Thus, the court concluded that LSA-R.S. 13:5106(B)(1) was invalid. Chamberlain, 624 So.2d at 888. Because subsection (B)(1) of the statute has been declared unconstitutional, the damage awards for the survival actions of decedents are not subject to any monetary limitations.
While LSA-R.S. 13:5106(B)(2) (which addresses suits for wrongful death) may also be unconstitutional under the rationale expressed by the Supreme Court in Chamberlain, we decline to address this issue inasmuch as the constitutionality of this statute is not an issue properly before this court. Thus, in its present posture, subsection (B)(2) of R.S. 13:5106 is still viable, and we must address its application to the wrongful death claims brought by the children of the decedents.
We conclude that each child could have brought suit separately for their wrongful death actions, thereby entitling each to a separate legal cap. Each party's demand for enforcement of a legal right is regarded as a separate action which may be cumulated in a single suit where there is a community of interest, each action is within the jurisdiction of the court and in the proper venue, and all actions are mutually consistent and employ the same form of procedure. LSA-C.C.P. art. 463; Ryland v. Liberty Lloyds Insurance Company, 617 So.2d 583, 590 (La.App. 3rd Cir.1993). The mere fact that all actions were brought together should not serve to penalize plaintiffs. Each child has a separate cause of action against defendants as a result of the child's loss of his or her parents.
Because the state's liability for the general damage awards to each child individually does not exceed $500,000.00, after being reduced by the decedents' percentage of fault, these awards are not subject to reduction pursuant to LSA-R.S. 13:5106(B)(2).
This assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Costs of this appeal in the amount of $1,823.29 are assessed in the amount of one-third against defendants, Glynn Delatte and the State of Louisiana, through the Department of Public Safety and CorrectionsLouisiana State Police, and two-thirds against plaintiffs, Hung Chi "Tim" Ly and City National Bank.
AFFIRMED.
NOTES
[1] The trial court found Tim's damages to be less than the other children because he was no longer living with the family at the time of the accident and death of his parents.
[2] Defendants argue in brief that the oldest child, Tim, and the oldest daughter, Oanh, were not fathered by Phat. However, the trial court concluded that Tim, an Amerasian, was adopted by Phat in Vietnam. Moreover, there is absolutely no evidence to suggest that Oanh is not the biological child of Phat.