637 So.2d 618 (1994)
Linda Wilkerson REID, Plaintiff-Appellee
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendants-Appellants.
SUCCESSION OF Rodney Glen REID, Plaintiff, Appellant/Appellee,
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendants.
Nos. 25,778-CA, 25,780-CA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1994.
*620 Tyler & Johnson by D.G. Tyler, Shreveport, for plaintiffs.
Richard P. Ieyoub, Atty. Gen., William J. Doran, Jr., Sp. Asst., William T. Kleinpeter, Dept. of Trans. & Dev., Baton Rouge, for defendants.
Before SEXTON, NORRIS and BROWN, JJ.
NORRIS, Judge.
The State of Louisiana, Department of Transportation and Development ("DOTD") appeals a judgment finding it 70% at fault in the accidental highway death of Rodney "Pete" Reid in a construction zone, and assessing damages of $887,906.00 in favor of the plaintiff, Linda Wilkerson Reid, for her husband's wrongful death, and damages of $10,411.41 in favor of Mrs. Reid, as administratrix of her husband's estate, for his survival action. By five specifications of error the State urges the trial court erred in finding it at all responsible for the accident, or in assigning the decedent only 20% of the fault; that if the State was at fault, its percentage should be much less than 70%; and in assessing damages greater than those awarded in other reported cases. For the reasons expressed, we affirm.

Factual background
The accident occurred on May 12, 1982, in the westbound lanes of Interstate 20 in Shreveport at the eastern edge of a large construction area. At the location of the accident, the State through its general contractor, Malvon Construction Company, was building the "F-1 Truss" foundation for an overhead sign to be erected for the eastbound lane. Although there were several contractors on the project, the State had ultimate control over the work; all important aspects had to be approved by DOTD's project engineer, Harrison Hannon. Some advance warning signs had been posted as early as February 1982, but the traveled portion of the southern (left) westbound lane was not blocked until May 7, the Friday afternoon before the accident. On that date Malvon directed the safety subcontractor, Hy-Co, to place large orange drums in a taper across the left lane, in front of a concrete barrier that protected the truss site; a steady-burning amber light was attached to the top of every other drum. The eastbound lanes had been blocked earlier; at some point Reid had joked with his supervisor, Jeff LaCaze, about "the great barrel race."
*621 Interstate 20 is for most of its course a standard expressway with two lanes running each way, east and west. However, after the westbound lanes crossed the Red River and entered Shreveport, an entrance ramp from Market Street merged into the interstate, forming a third lane on the left side. It is this third lane that was tapered off and closed soon after it was available to westbound drivers. The taper began immediately after a crest and as the road began a curve to the driver's right. Other details about the taper are discussed later in the opinion.
Shortly after 2:00 p.m. on Wednesday, May 12, Pete Reid was driving his pickup truck west on I-20 from his home in Bossier City to his job at the school board in Shreveport. Traffic was dense and moving slowly because of the construction. According to eyewitnesses José Vidales and Melton Cook, Reid was driving in the left lane, but when the Market Street entrance made a third lane available, he pulled into it and passed several vehicles. Because of the heavy traffic he was unable to merge back into the center lane. Apparently he only then noticed how close he was to the orange drums tapering off his lane. He slammed on his brakes but could not avoid hitting a drum, careening to his right across the other lanes of traffic, smashing into Cook's 18-wheeler in the right lane, then ricocheting back into the concrete barrier, where his truck came to rest. Although EMS personnel arrived promptly, they were unable to revive Reid, and he was pronounced dead at LSU Medical Center.

Procedural background and action of the trial court
As a result of the accident and death Mrs. Reid filed three lawsuits, all of which were consolidated for trial. The first suit asserted Mrs. Reid's wrongful death action, the second her son's wrongful death action, and the third Pete Reid's survival action. The defendants were the State DOTD; Malvon Construction Company, its general contractor on the project, Hy-Co Safety Light Company, the subcontractor for safety equipment, and Martin and Martin Foundation Drilling, another subcontractor; and Melton Cook, the driver of the 18-wheeler with which Pete Reid ultimately collided, together with his employer and lessor and their insurers. Martin and Martin was dismissed by summary judgment in 1983; Malvon and Hy-Co were dismissed by summary judgment in 1990. Melton Cook and the parties associated with him settled with Mrs. Reid in 1988. She therefore proceeded to a bifurcated trial in 1991 and 1992 against the only remaining defendant, the State DOTD.
In written reasons for judgment the trial court summarized the evidence, discussing at some length the opinions of the three experts who testified: Dr. Olin Dart and Mr. Hibbett Neel, who testified as traffic engineers for the State, and Dr. John Glennon, who testified in traffic engineering, highway design, traffic safety management, and accident investigation and reconstruction for the plaintiff. The court concluded that the taper in the left lane did not meet safety standards, being only 39% of the minimum length prescribed by the Manual of Uniform Traffic Control Devices ("MUTCD"), that the condition of the Interstate required, if anything, a longer taper than the minimum, and that the State also failed to install an arrow board to alert drivers of the danger at a greater distance. The court further found that MUTCD minimum standards contemplate a degree of inattentiveness on the part of drivers, and provide adequate space for such drivers to merge safely out of the closed lane. The court therefore adopted the opinions of Dr. Glennon and concluded that the inadequate taper and absence of an arrow board were the primary cause of the accident. The court assessed fault 70% to the State, 20% to Reid, and 10% to Cook, the driver of the 18-wheeler.
After the trial on quantum, the court prepared written reasons which again summarized the pertinent evidence, with special attention to the uncontradicted expert opinion of Dr. Randolph Rice, Mrs. Reid's economist. Dr. Rice calculated Reid's lost past earnings, after personal consumption, at $160,345; lost future earnings, discounted and after personal consumption, at $314,002; lost retirement benefits, discounted and after personal consumption, at $50,966; and loss of services at $124,586. Noting her "extraordinarily close *622 and loving relationship" with her husband, the court awarded Mrs. Reid $300,000 for his wrongful death, and $300 for psychiatric examination, for a total of $887,906. In the survival action, the court awarded $7,500 for Reid's pre-impact fear, plus stipulated funeral and medical expenses, for a total of $10,411.41. Finally, the court awarded Mrs. Reid $100,000 for her son's wrongful death claim, with $150 for psychiatric treatment, for a total of $100,150.
The State has appealed the judgment, contesting the allocation of fault and the amount of Mrs. Reid's wrongful death and survival awards.[1]

The Interstate and the taper
The evidence concerning the lane closure fell into three general categories: advance warning, sight distance, and taper. See R.pp. 872-873. Harrison Hannon, the DOTD's project engineer for the F-1 Truss, testified that most of the signs were posted by February 5, 1982. The signs originally installed measured 48 × 48", but these were replaced with 36 × 36" signs after the larger ones were nicked by passing trucks. David Turner, project engineer for the State's general contractor, Malvon, testified that he posted the six advance warning signs, which read, "Left Lane Closed 1 Mile," "Left Lane Closed ½ Mile," and a symbol sign showing left lane closure; each of these was posted on both sides of the Interstate. The signs were up for some three months before the accident occurred. Mr. Neel, one of plaintiff's traffic engineers, admitted that displaying construction signs for a substantial time could result in diminished respect and attention for the signs. R.p. 862.
The expert witnesses testified that each traveled lane of the Interstate was 12 feet wide, and that the shoulder to the left of the third (left) lane was nine feet wide. The third lane ran for one half mile before the F-1 Truss site. As noted earlier, the westbound approach to the F-1 Truss was on the downward slope of a crest and in a right-turning bend of the road. The witnesses also established (in accord with MUTCD § 6C-2) that the minimum desirable length of the channelizing taper was based on the formula L = S × W, where L stands for length of taper, S for speed limit and W for width of lane. Thus the minimum taper for a 12-foot lane in a 55 mph zone is 660 feet. The drums were roughly 50 feet apart. DOTD's project engineer, Harrison Hannon, testified he originally planned to set out a 660-foot taper, but after consulting with his inspector, Earl Everette, he increased it to 880 feet, running from the left edge of the shoulder across the left lane and to the concrete barrier. No one measured the taper on the day of the accident; the experts reconstructed it from photos taken at the scene, and on this basis they disputed whether the effective length of the taper met minimum standards. All the traffic experts testified that under the MUTCD, drums on the shoulder did not count toward the total taper length. R.pp. 800, 836, 880. As there were apparently three drums on the shoulder, this diminished the taper's effective length by about 150 feet; Dr. Dart estimated the taper was only about 500-550 feet, and under minimum. Dr. Glennon added that according to the photos, the last several drums before the concrete barrier did not actually taper across the lane, but were lined parallel to the right edge of the closed lane; therefore they did not belong in the taper either. He testified that only six or seven drums were actually in the taper, for a total length of about 250 feet, or 38% of the minimum prescribed by the MUTCD. R.p. 882. Dr. Dart did not express an opinion as to the parallel drums because he thought the rescue personnel may have moved them, but he did not dispute Dr. Glennon's finding that the total taper was only about 250-290 feet. Taper length was particularly important because, as all the experts agreed, it affected the amount of time in which a driver could merge into the next lane. A full taper of 660 feet afforded four seconds at 55 mph. A taper of 250 feet allowed only 1.6 seconds.
*623 As for sight distance, Mr. Hannon testified that he could see the first drum from the bridge over the Red River, some 1,100 feet away, and the experts corroborated this. Because of the curve in the road, however, Dr. Glennon testified that the sight distance to the first drum should have been at least 1,500 feet. He conceded that placing the first few drums on the left shoulder may have made the taper somewhat more visible, but the additional 150 feet or so was not enough. He testified that 95% of lane closures use illuminated arrow boards; Mr. Neel testified that these increased sight distance to about 2,000 feet. R.p. 860. The evidence shows that Hy-Co, the State's safety subcontractor, had actually recommended using an arrow board, by means of a letter to Malvon, the general contractor, and Hannon, the DOTD project engineer, dated May 7, 1982. There was some uncertainty about when they actually received the letter and discussed its contents, but it was before this accident. The letter states that the "present method being used is dangerous and may result in inconvenience and injury to the public." Hannon testified that he rejected Hy-Co's proposal because he assumed at the time that the median was only six feet wide and would not hold an arrow board (earlier, in deposition, he stated he assumed the median was only four and a half feet wide), and because putting an arrow board too far ahead of the construction site would be "misleading." R.p. 732. He also rejected Hy-Co's proposal because he viewed it as part of a package proposal for Malvon to reopen the Interstate each day at 3:45 p.m. ("Move all barrels back against median at 3:45 p.m. to allow traffic full highway use when workers are not on job") and he considered it hazardous to leave a 40-foot hole open at night. R.p. 764.

Applicable law
The State's legal duty, as noted by the trial court, is defined in part by La.R.S. 48:35A(1), which requires DOTD to adopt minimum safety standards with respect to highway design, construction and maintenance; these standards are to conform insofar as possible to those approved by the American Association of State Highway and Transportation Officials. The statement of duty is actually an expression of the basic codal law of negligence. La.C.C. art. 2315.
Particularly, the law imposes on DOTD the duty to maintain public roads in a safe condition so as not to expose the public to unreasonable dangers. This general duty includes in its scope the more specific duty of providing proper safeguards or adequate warnings of dangerous conditions on the highway:
The Department [DOTD] clearly has a duty to warn motorists of dangers engendered by ongoing road repair. The duty of reasonable care operative under negligence principles requires [DOTD] to erect barriers, signs and markings which are sufficiently effective to warn the public of dangerous road conditions. Warnings should be sufficient to alert the ordinary motorist. The law imposes a high degree of care on governmental agencies charged with the responsibility of maintaining traffic signs, signals and warnings devices.
Stephens v. State through Dept. of Transp., 440 So.2d 920, 925-926 (La.App. 2d Cir.1983), writ denied 443 So.2d 1119 (1984) (emphasis added).
Although compliance with the principles and standards of MUTCD is prima facie proof of a road authority's absence of fault when an injured motorist attempts to predicate liability on improper signalization or road markings, noncompliance with the manual is not negligence per se; the injured motorist must prove the authority acted unreasonably under the circumstances. Hatcher v. State through Dept. of Transp., 467 So.2d 584 (La.App. 3d Cir.), writ denied (but remanded on other grounds) 471 So.2d 724 (1985). DOTD is not the insurer of the safety of drivers using state highways, but it cannot knowingly allow a condition to exist which is hazardous to a reasonably prudent motorist. Hood v. State through Dept. of Transp., 587 So.2d 755 (La.App. 2d Cir.), writs denied 590 So.2d 81, 82 (1991).
If a person suffers injury, death or loss as a result partly of his own negligence and partly as a result of the fault of another *624 person, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss. La.C.C. art. 2323. In assessing the nature of the conduct of the parties, courts refer to various factors:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). The Supreme Court has announced a two-part test for reversing a factfinder's determinations:
1. The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2. the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State through Dept. of Transp., 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id.; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell v. ESCO, 549 So.2d at 844-845. Nonetheless, the reviewing court must keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990) (emphasis added). The trial court's allocation of fault is also subject to the manifest error rule. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984).
Damages may include loss of consortium, service and society. La.C.C. art. 2315. In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge or jury. La.C.C. art. 2324.1; Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Coco v. Winston Industries Inc., 341 So.2d 332, 335 (La.1977).
On the issue of lost services, in Marceleno v. State Dept. of Highways, 367 So.2d 882 (La.App. 2d Cir.1978), writ denied 369 So.2d 1364 (1979), this court recognized that the testimony of experts such as economists as to the value or cost of replacement of household services has value to the trier of fact in the almost imponderable task of assigning a dollar amount to the survivors' loss. Later, in Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986), writs denied 501 So.2d 213, 215 (1987), this court noted that Louisiana had not yet recognized a separate award with a specified dollar value for loss of services where there is no evidence of actual payment for the replaced services, but that the loss was usually considered in determining *625 the general nonpecuniary damages for wrongful death. Thomas, 499 So.2d at 565. Subsequently, however, in Moore v. Chrysler Corp., 596 So.2d 225 (La.App. 2d Cir.), writs denied 599 So.2d 316, 317 (1992), this court analyzed amendments in the law and concluded that a proof of "actual out-of-pocket losses" was not necessary to support an award for lost services. See also Dixon v. Mid-South Rail Corp., 580 So.2d 438, 444 (La.App. 2d Cir.), writ denied 584 So.2d 1160 (1991).
The survival action, now specifically authorized by La.C.C. art. 2315.1, permits recovery of all damages for injury to the decedent. Damages are properly awarded if there is a scintilla of evidence of any suffering or pain on the part of the decedent by his actions or otherwise. Temple v. Liberty Mutual Ins. Co., 330 So.2d 891 (La.1976). Damages may include the decedent's pre-impact fear. Thomas v. State Farm Ins. Co., 499 So.2d at 562.

Discussion: Liability and allocation of fault
By its first four specifications of error, the State urges the trial court erred in applying an improper standard to the conduct of DOTD, in finding that the condition before the F-1 Truss constituted a trap, in failing to find that the fault of Pete Reid was the overriding, intervening and sole cause of the accident, and in assessing any comparative fault to the State.
In support, the State relies heavily on the testimony of the eyewitnesses, José Vidales and Melton Cook. Specifically, it cites Sgt. Vidales's remark that Reid "was passing everybody behind me, and that is when he passed me and a lady that was driving in front of me," traveling at such a speed that when he braked there was "no way he could control that thing." Vidales Dep., 6, 8. Vidales, who was in the center lane, also testified that he could see the first drums after he came over the rise in the road, at a point when Reid was passing him; there was no reason Reid could not see the taper earlier, except that he was trying to "beat them." Dep., 26. Mr. Cook, who ultimately collided with Reid's truck, testified that traffic in the area was heavy and slow due to the construction; he saw Reid drive up alongside him in the center lane, then switch to the left lane to pass some 15 vehicles ahead of him. Cook Dep., 6-8. He estimated Reid was going about 70 mph after he changed lanes and downshifted. Dep., 24. He lost sight of Reid's truck until he noticed the plume of water from the drum that Reid struck. Dep., 10. From this the State argues that the signs indicating the lane closure were clearly visible to the oncoming vehicles; that Reid simply grew impatient, switched lanes and attempted to pass 15 vehicles; that this was a "negligent, reckless and even daredevilish maneuver."
The State further discounts the plaintiffs' emphasis on the deficiencies in the taper, first contesting the expert finding that it totaled only 292 feet in length; the State urges this is "simply not supported by the evidence," though it concedes the taper was "slightly" shorter than the MUTCD minimum of 660 feet. The State contends that except for this accident, there is no evidence that the taper was not functioning properly. Second, the State claims the sole issue is whether the advance warning signs were adequate, and argues that they were, for the average, prudent driver. Finally the State disputes the trial court's finding that an arrow board would have prevented the accident; this, it claims, is extremely speculative since the accident occurred during daylight hours. In sum, the State contends the trial court mistakenly placed undue emphasis on the expert testimony, which had "very little basis in fact," and urges this court to emphasize the negligence of Pete Reid.
We acknowledge that the trial court's written opinion is spare in its discussion of Reid's fault. The proper allocation of fault requires an analysis of both parties' conduct. Watson v. State Farm, supra; cf. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The trial court implicitly considered Reid's conduct when it assigned 20% fault to him.
As for Reid's fault, we must disagree with the State's position that the eyewitness testimony clearly makes him wholly at fault. *626 The State has reiterated Mr. Cook's statement that Reid was speeding in the left lane at 70 mph, but this is contradicted by Dr. Glennon's accident reconstruction, in which he estimated Reid's speed at 33 to 48 mph when he hit the drum and 51 to 54.9 mph when he hit Cook's 18-wheeler. R.pp. 885-886. The police officer who investigated the accident also did not note reckless driving. R.pp. 618-619. Further, Cook's account of a zigzag path taken by Reid's truck before it struck the 18-wheeler was not supported by either Sgt. Vidales's testimony or Dr. Glennon's expert accident reconstruction. Cook Dep., 10-12; Vidales Dep., 8-9; R.pp. 883-887. In short, the trial court was not plainly wrong to discount Cook's rendition of the accident. With respect to Sgt. Vidales's testimony, he did in fact state that Reid was traveling at a high rate of speed. The trial court, however, also noted Vidales's remark that "after the turn, it was all of the sudden there." Vidales Dep., 12. The court obviously interpreted this to mean that the taper closed in more suddenly than the advance warnings and the view of the taper actually suggested. We also note that the drums were placed in the westbound lane only a few days before the accident. It is likely that Reid encountered this closure only twice before May 12.
As for the State's fault, we do not agree that the effect of the inadequate taper was minimal. Dr. Glennon testified that he had taken part in revisions to the MUTCD, and the trial court explicitly accepted his opinion as the most plausible and reasonable. He conceded that the advance warning signs were adequate, but testified that the taper was the most important element of traffic control at this location. R.p. 902; MUTCD § 6C-2. The MUTCD specifically addresses the relationship between advance warning and taper:
The success or failure of a lane closure will often depend upon the ability of traffic in a closed lane to merge with the adjacent lane. In practice this merge does not usually take place until the taper barricades, cones or other devices are encountered. For this reason the taper length must be sufficiently long to give drivers every opportunity to find an acceptable gap in the adjacent lane before having to slow down or stop and impede other traffic. Under relatively normal conditions of speed and volume, and where adequate warning of a lane obstruction has been provided, the taper rate described in section 6C-2 should be sufficient. However, this length should be adjusted as required by traffic conditions.

MUTCD, § 6G-4 (emphasis added).
Dr. Glennon further testified that a minimum taper of 660 feet would have given Reid 4 seconds to merge; the taper in place gave him only 1.6 seconds. R.p. 911. Given the distance required to stop a vehicle traveling 55 mph, even Dr. Dart conceded Reid could scarcely have made an emergency stop in the space of this taper; in a 660-foot taper, he could have made a controlled stop. R.p. 925-926. The quoted passage also verifies Dr. Glennon's opinion that with the crest and the curve, a longer taper was needed, and he would have installed one 25% longer than the minimum. R.p. 912. The record supports the trial court's conclusion that the taper was inadequate.
Next, the State's attempt to dismiss the benefit of an arrow board as speculative is not supported by the record. Every witness agreed that the first drum was visible from 1,100 or 1,200 feet away. Dr. Glennon testified that with the crest in the road and the curve to the right, a sight distance of 1,500 feet was required. R.p. 890. Mr. Neel testified that an arrow board would enhance the sight distance to 1,500 to 2,000 feet. R.pp. 860. The aggravating factor in the State's conduct is that its safety subcontractor, Hy-Co, recommended an arrow board just days before this accident. Mr. Hannon's reasons for rejecting the proposal were unconvincing to the court, and we see no basis to disturb this credibility call: it is unlikely that the State's project engineer would not know the width of the shoulder and whether an arrow board would fit in it; he offered no reason he could not have approved a portion of Hy-Co's letter and disapproved the impracticable part; and Dr. Glennon testified that arrow boards are regularly used in 95% of lane closures. In short, we perceive no manifest *627 error in the court's finding that the sight distance was inadequate and the taper itself, dangerously so. Stephens v. State through Dept. of Transp., supra.
The court also cited Dr. Glennon's criticism of the State for failing to conduct an engineering study or fashion a traffic control plan before putting out the taper, and for failing adequately to monitor the traffic flow after. See MUTCD §§ 1A-4, 6A-5-1(b), 6A-5-4. The court viewed these as activities which, if performed, would have alerted the State to the problem and led to an adjustment.[2]
In balancing the comparative fault, the court stated that Reid was traveling too fast for the road conditions; this was a contributing factor, and a substantial one, in the accident. The court further found that Mr. Cook, the driver of the 18-wheeler, had a superior view of the situation and could have taken better evasive action to avoid colliding with Reid. They were assessed with 20% and 10% respectively. The State's fault, for the reasons already discussed, was set at 70%. Applying the Watson factors we note that the State had a definite awareness of the danger involved in closing a lane of the Interstate, and the risk thereby created was great. In the State's favor is the objective of modernizing the Interstate as opposed to Reid's transient goal of passing some traffic. The State's capacity to avert the danger by properly following the MUTCD was obviously superior to Reid's, though Reid had the capacity to avert the accident by maintaining closer attention to the advance signs. The most important other factor is the high degree of care imposed on the State to alert the ordinary motorist to dangerous road conditions. Stephens v. State through Dept. of Transp., supra. We agree that the record supports a substantial amount of fault on the State's part. We admit that Reid was very imprudent in darting into the open lane, and on this record we could have affirmed a significantly higher degree of plaintiff fault. However, with Dr. Glennon's testimony that channelizing devices should anticipate the inattentiveness of drivers, the recognition of the MUTCD that most drivers do not merge until they reach the beginning of the taper, and the astonishing inadequacy of this particular taper despite specific advice from the subcontractor that would have improved it, we cannot say the trial court abused its great discretion to assign 70% of the fault to the State. The allocation of fault is not plainly wrong. Towns v. Georgia Cas. & Sur. Co., supra. This aspect of the judgment will therefore be affirmed.

Quantum
By its final specification the State contests as excessive the award of $300,000 general damages for Mrs. Reid's wrongful death action, the award of $124,586 for economic loss of services, and the award of $10,411.41 for the survival action.
In its wrongful death argument, the State primarily relies on this court's opinion in Thomas v. State Farm Ins. Co., supra. In that case we catalogued the "mass of general damage awards" for the loss of a spouse and found that they ranged from $7,500 to $200,000, with $100,000 being the most frequent award closely followed by $150,000. Id., 499 So.2d at 566. The State also cites Hampton v. Rubicon Chemicals Inc., 579 So.2d 458 (La.App. 1st Cir.1991), as an instance of the loss of a husband who, like Pete Reid, was a handyman and devoted to his family in a "model of family closeness." The court of appeal affirmed an award of $150,000 to the surviving spouse, and the State urges this amount would be proper for Mrs. Reid.
Damages insusceptible to precise measurement, such as wrongful death, are wisely left to the great discretion of the trier of fact. La.C.C. art. 2324.1; Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d at 1261. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances *628 that the appellate court should increase or reduce the award. Id. The awards in prior cases are only an aid and "rivet no steel frame of uniformity." Miller v. Thomas, 258 La. 285, 246 So.2d 16, 19 (1971). If it finds an abuse of the trial court's great discretion, the appellate court may adjust the award only to the extent of lowering (or raising) it to the highest (or lowest) point reasonably within the court's discretion. Coco v. Winston Industries Inc., supra.
The trial court's reasons are extensive in its treatment of Mrs. Reid's loss. Dr. Joe Ben Hayes, a psychiatrist who treated Mrs. Reid, found extreme anguish on the part of a young wife over whom her husband was "quite protective." Dr. Hayes diagnosed an extreme grief reaction with moderate to severe depression. Mrs. Reid's friend, Mrs. Boddie, corroborated that Mrs. Reid was emotionally broken from the death. Mrs. Reid herself testified that she was overwhelmed with the reality of the economic hardships that would follow the loss of her husband. The court concluded that she and Pete had an extraordinarily close and loving relationship, and on the instant record this is not plainly wrong.
In light of this finding the court felt that the higher-end wrongful death awards were more apposite than the mass of general damage awards. It cited Mathieu v. State Dept. of Transp., 598 So.2d 676 (La.App. 3d Cir. 1992), which upheld an award of $350,000, Hellmers v. Department of Transp., 503 So.2d 174 (La.App. 4th Cir.), writ denied 505 So.2d 1141 (1987), which upheld an award of $325,000, and Comberrel v. Basford, 550 So.2d 1356 (La.App. 5th Cir.1989), writs denied 556 So.2d 1284, 1286 (1990), which upheld an award of $330,000. On the showing of the close relationship that Mrs. Reid and her husband enjoyed, the devastating loss she sustained, and the jurisprudence of awards for close relationships, we do not find the trial court abused its great discretion in fixing general damages at $300,000. This portion of the award will be affirmed.
For the loss of economic services, the State relies on Thomas v. State Farm Ins. Co., supra, which suggests that a separate award for these damages is not recognized when there is no evidence of actual payment for the replaced services. Id., 499 So.2d at 565. However, the State does not urge that the award is for this reason invalid; instead, it suggests that it should be reduced.[3]
At the outset we note that a claim for lost services is not defeated by absence of proof of actual out-of-pocket replacement costs. Moore v. Chrysler Corp., 596 So.2d at 241. The award may stand on testimony that the services were necessary and on expert evidence to generate a reasonably certain estimate of the quantum. Pete Reid's father established that Pete was an able handyman, having worked as a painter and mechanic. Mrs. Reid testified that they bought an older house in Bossier City at an economical price because it needed many repairs, which Pete had already begun; and that he was in the habit of doing all sorts of household repairs, carpentry and painting, repairing appliances and automobiles, and doing yard work and tending the garden. Dr. Randolph Rice, Mrs. Reid's expert economist, testified by deposition that if Pete had done such work 16 hours a week at a replacement cost of $5.00 per hour, until he reached age 70, the discounted loss would be $124,586. The State put on no evidence to contradict Dr. Rice's findings. Under the circumstances, the trial court did not abuse its discretion is making this portion of the award; it will be affirmed.
Finally, the State asserts that there is no evidence that Pete Reid survived for any period of time after the accident, and the survivor action should therefore be denied in its entirety. However, in Thomas v. State Farm Ins. Co., 499 So.2d at 567, this court approved an award for the decedent's preimpact *629 fear, reducing the quantum from $15,000 to $7,500. The eyewitness, Sgt. Vidales, testified that Reid braked hard before striking a drum in the taper; this indicates a definite, though belated, apprehension of his peril. The court also reasonably inferred an instant of terror as Reid's pickup skidded across the Interstate before its fatal impact with the 18-wheeler or the concrete barrier. On these facts the court did not abuse its discretion in awarding $7,500 for Reid's preimpact fear. This portion of the award is also affirmed.

Conclusion
For the reasons expressed, the judgment is affirmed in its entirety. Costs of appeal in the amount of $390.50 are assessed to the State of Louisiana, Department of Transportation and Development, in accord with La. R.S. 13:4521.
AFFIRMED.
SEXTON, Judge, dissenting.
I agree that we cannot say that the trial court was clearly wrong in determining that the taper was substandard and thus played a significant role in the accident. In my view, however, on this record, the trial court could just have easily have exonerated the state.
The testimony of the eyewitnesses is consistent that the plaintiff was attempting to beat the traffic in front of him to the end of the taper. This plaintiff was in the left lane all by himself. He pulled out into that lane by downshifting at about 55 m.p.h. The rest of the traffic had already merged. The plaintiff was not a stranger to this situation, as he had travelled this path under these circumstances at least once previously. The trial judge assessed his impact speed with the barrel at 48 to 53 m.p.h. The record shows that the plaintiff braked so hard that his tires were "smoking." Therefore, it is clear that shortly before braking, plaintiff's speed was seriously excessive.
In summary, this plaintiff was speeding excessively and purposefully. He knew, or should have known, this situation existed. In fact, he could see it. The trap was largely of his own making.
Thus, in my judgment, the assessment of percentages of fault by the trial court was clearly wrong to a significant degree. Indeed, the allocation of any degree of fault to the truck driver, Cook, causes me serious pause as to the instant fault allocation decision. On this record, I suggest that the lowest degree of fault on the part of the plaintiff which could be affirmed is 50 percent. I view anything less as a reward for his foolhardy conduct. I had hoped that comparative fault would allow us to properly quantify responsibility in torts so that the excesses of contributory negligence could be avoided and at the same time allow one not to be unduly rewarded for substandard conduct. I suggest that this is the sort of result that may argue for a return to contributory negligence.
Also, I view the damages for wrongful death as being at least 25 percent too high, and I have misgivings about the perpetuation of the concept of damages for preimpact fear, per Thomas v. State Farm Insurance Co., 499 So.2d 562 (La.App.2d Cir.1986), writs denied, 501 So.2d 213, 215 (La.1987).
I therefore respectfully dissent.
NOTES
[1] As noted, Cook and the parties associated with him settled with Mrs. Reid in 1988. His 10% allocation of fault has not been appealed.
[2] The court cited other MUTCD violations as well. These included excessively weighting down the drums in the taper, placing lights atop only every other drum, and displaying the advance warning signs for three months before construction actually began.
[3] The State argues that in Thomas this court reduced the award of projected past and future losses of household services from $199,067 to $150,000, and that the instant award should also be lowered to $150,000. However, the instant award for lost services is only $124,586. Opinion on Quantum, 11-12,19.