| iWALTZER, Judge,
concurring in part and dissenting in part with reasons.
I agree with the majority’s modification of the award to Robert Harden excluding the award for Mr. Harden’s past and future lost wages and earning capacity, and for Mrs. *453 Harden’s lost past and future earning capacity. I agree that Mr. Harden failed to show that the trial judge made a mathematical error in computing his share of the award. I also concur in the rejection of Robert Harden’s claims that the LPCF’s total liability should exceed $400,000 because the limitation applies only to amounts for which the Fund is east in judgment, and in the rejection of his claim for past and future psychological and/or medical treatment. I also concur with the majority’s determination that legal interest is due on Mr. Harden’s entire award from the date of filing the complaint with the LPCF Oversight Board. As' to the remaining issues, I respectfully dissent.

THE FUND’S THIRD ASSIGNMENT OF ERROR: The jury’s separate awards to Mr. Harden for “loss of love and affection, society, consortium and services and enjoyment of life” and for “past and future mental anyuish” are |-¿duplicative, based on insufficient evidence and the jury was deprived of relevant, admissible evidence on this issue.

The award for “Loss of love and affection, society, consortium and services, and enjoyment of life” includes the “past and future mental anguish” suffered by Mr. Harden as a result of his wife’s death. I would amend the judgment to delete the duplicative $150,-000.00 award. See, Koepp v. Sea Land Service, Inc., 93-2562 (La.App. 4 Cir. 11/17/94), 645 So.2d 1269, 1278.
The evidence the Fund complains was not before the jury, testimony by Mrs. Harden’s sisters generally relating to alleged incidents and conversations among the sisters having occurred over 20 years ago, was held by this Court to be irrelevant and inadmissible when it granted plaintiffs emergency application for supervisory relief. This issue having been litigated between the parties, this Court need not revisit the issue on appeal. The record shows that the Fund did not attempt to call the witnesses at trial, and has waived its objection.

ROBERT HARDEN’S FIRST ASSIGNMENT OF ERROR: The purported minor’s settlement is null and of no effect.

Subsequent to the Fund’s appeal (22 July 1994), and Mr. Harden’s appeal (8 August 1994), on 17 August 1994 the Fund and Ms. Moore, on behalf of Erie, filed in Civil District Court a joint petition for authority to settle the minor’s claim. While I recognize the desirability of amicable resolution of legal disputes, the trial court’s order authorizing the minor’s settlement is a nullity. The law is clear that the jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested on the granting of the order of appeal and the timely filing of the appeal bond for a suspensive appeal, or on the granting of the order | gpf appeal in the ease of a devolutive appeal. La.C.C.P. art. 2088. The minor’s settlement is not one of the ten enumerated exceptions to this rule. Where, as here, there are competing claims to a limited fund, the approval of the minor’s settlement is clearly a matter reviewable on appeal, since it impacts the errors raised by both Mr. Harden and Eric concerning the apportionment of the proceeds. The problem is compounded where, as here, the settlement was obtained ex parte and without prior notice to Mr. Harden. I believe that under the facts of this ease, the trial court’s order approving the minor’s settlement is a nullity apparent from the face of the record and may be urged at any time and before any court in which the order is sought to be enforced. La.C.C.P. art. 2002(3); see, Zatzkis v. Zatzkis, 93-0366 (La.App. 4 Cir. 12/16/93), 629 So.2d 1285, 1287, writ denied 94-0159 (La. 6/24/94), 640 So.2d 1340. I would give no effect to this purported settlement.

ERIC HARDEN’S ANSWER TO APPEAL: The trial court abused its discretion in awarding a greater sum to the adult surviving spouse than to the minor of tender years.

The trial court made no finding as to the damages sustained by Eric Harden, merely apportioning the $500,000 statutory liability in the ratio of 60% to Mr. Harden and 40% to Eric. My independent review of the record convinces me that Eric Harden suffered and will continue to suffer damages far greater than those sustained by his former adoptive father.
*454 EVIDENCE CONCERNING ERIC HARDEN’S DAMAGES
Eric Harden was born to an unknown women and abandoned. At just over seven months of age, he was placed in the custody of Mary Sylvia Harden and | .Robert Harden, then residents of Pittsburgh. The Hardens adopted Eric in July, 1984, but never advised him that he was their adopted son. On 11 May 1988, Mary Harden died, and Eric remained in Robert Harden’s custody until 17 August 1990, when Robert Harden voluntarily surrendered Eric to the custody of the State of Louisiana.
Joe Maggiore, MSW, handled the surrender on behalf of the state agency. He testified that Harden surrendered the child because as an admitted alcoholic he could not provide the supervision Eric required. Maggiore met Harden four times over a period of two weeks and offered Harden free counseling services to deal with his alcoholism and parenting concerns, but Harden refused the services. Maggiore went to Harden’s home to pick up Erie, and testified that the conditions at Harden’s home were so deficient that the child would have been removed from his custody, at least temporarily, even had Harden not surrendered Eric voluntarily. Maggiore described Harden’s small apartment as being inadequately furnished, having broken windows and screen doors. Some of the apartments in his complex were boarded. In abandoning Eric to State custody, Mr. Harden denied the existence of his wife’s surviving relatives, although in deposition he admitted that Eric’s only relatives here were Mrs. Harden’s family. Mr. Harden told the state agency that his own relatives, who lived in Pennsylvania, were unsuitable custodians, were either on welfare and food stamps, on drugs, or in jail. Mr. Harden admitted that he has not spoken to Eric since the surrender, and testified by deposition in November 1992 that he had no idea where Eric was.
In August, 1990, Eric was placed in foster care with the Walker family. Eric’s hyperactivity, intermittent bedwetting and compulsive behavior of beating his head at night, together with poor integration into the Walker family, led the 15Walkers to return him to State custody in March, 1991. Mrs. Walker testified that when Eric arrived he refused to put his toys down, carrying them with him from room to room as if he were afraid that they would be taken away from him or he would lose them. The front of his forehead was pushed in and black from banging on the floor. Eric told her that he cried because no one loved him and because his father said at the surrender that he didn’t ever want to see Erie for as long as he lived. Eric told Mrs. Walker that his father hated him, had told Eric that Eric was never going to amount to anything, and blamed Eric for his mother’s death.
Eric’s physician, Dr. Chakraborti, recommended that Eric be placed in Bethlehem Treatment Center, an institution where his medication could be regulated, and appropriate structure and counseling could be provided pending another foster or adoptive placement. The Bethlehem intake report shows a diagnosis of attention deficit hyperactive disorder, and adjustment disorder of childhood with mood disturbance. Erie adjusted well to life at Bethlehem, where he received intensive psychotherapy with therapist Lynn Charles. During the course of his treatment, Eric disclosed sexual abuse by Mr. Harden, beginning after Mrs. Harden’s death.[1] While at Bethlehem, he developed a mutually caring relationship with Bethlehem nurse Venus Moore, in whose foster custody he was placed in December 1991. Ms. Moore formally adopted Erie in January 1994.
|6The testimony offered at trial proves that Eric had a very close relationship with Mrs. Harden, who was a caring, nurturing mother. At the age of 39, she voluntarily left the work force in order to devote herself to her newly adopted child. Eric’s grief at her passing *455 was well established. He often asked to visit his mother, and took no joy in activities he had earlier pursued with her, such as visits to the park. His adjustment was complicated by his medical problems and significantly by Mr. Harden’s failure to explain the circumstances of Mrs. Harden’s death, by blaming Eric for her death, and by the actions that formed the basis of Mr. Harden’s guilty plea to the reduced charge of contributing to six-year-old Eric’s delinquency. The failure of the Walker placement required further adjustment by Eric.
The evidence established that Eric was an “A” student while Mrs. Harden was alive, but that his school achievement and behavior deteriorated after her death. Dr. David Kidder, an expert in psychology, evaluated Erie at Bethlehem. He identified Eric as at least average in intelligence (130 performance I.Q. and a 72 verbal IQ)[2], with the potential of high average to superior intelligence, but showing distinct signs of anxiety, restlessness, impulsive response, dependence upon fantasy for gratification, preoccupation and unresolved grief regarding the death of his mother, hyperactivity, attention deficit problems, somatic complaints, indeeisiveness, uncertainty and insecurity. Eric was not clinically depressed. Dr. Kidder found no evidence in the medical reports of fetal alcohol syndrome or alcohol abuse by Eric’s biological mother. Dr. Kidder testified that his notes show Mr. Harden sexually abused Eric and testified, based upon his experience in ^treating sexually abused individuals, that such individuals in later life may encounter periods of memory loss, problems in sexual relationships, may become abusers themselves and may allow themselves to become sexually abused.
While he still takes the drug Ritalin to control hyperactivity, Eric’s head banging, disruptive behavior and bedwetting have ceased. Maggiore described Eric as one of his agency’s success stories, success which Maggiore attributed to Bethlehem and to Ms. Moore’s “good, stable, healthy, loving environment.” Maggiore expected Eric to thrive as Ms. Moore’s son.
Eric, who was ten years old at the time of trial, testified that his mother told him stories, sang lullabies and tucked him into bed. He testified that after Mrs. Harden’s death, Mr. Harden abused him by telling him “to do disgusting stuff.” He testified that Mr. Harden took him to visit his “Aunt Sis”, where he would sometimes spend the night. EVIDENCE CONCERNING ROBERT HARDEN’S DAMAGES
The jury heard testimony concerning only Robert Harden’s wrongful death claim. He testified that he was born on 29 July 1935. He married Mary Sylvia Harden on 31 March 1958, five years into his twenty-three year career as an investigative military police officer. Mrs. Harden was 18 or 19 when they married. Mr. Harden described a traditional household. He separated from active duty in 1976 and returned with his wife to his hometown, Harrisburg, Pennsylvania where he worked as a security guard for Pinkerton’s Detective Agency. He testified that although he and his wife wanted to have children, he was unable to father a child. In 1984, the Hardens adopted Eric, and in the adoption questionnaire described their marriage as a good one, based on love, trust, faith, and mutual respect. In 1986 or 1987, the Hardens moved to NewJgOrleans, where Mrs. Harden’s family lived.[3] Mr. Harden worked for Pinkerton’s as an investigator, and at the time of Mrs. Harden’s death, he worked as a deputy Orleans Parish Criminal Sheriff. He testified that after her death, he quit working, allegedly to take care of Eric. He testified that after he surrendered Eric to State custody, he “was still going to pieces” and couldn’t work. On cross examination, he was confronted with his deposition testimony that there was no reason why he couldn’t have gone back to work as a deputy sheriff after his wife’s death.
Harden testified that in 1987 Mrs. Harden went to school and received a Medical Assis *456 tant’s certificate. Mrs. Harden never worked as a medical assistant, and never worked while in New Orleans. Her last employment was as a computer operator in Pennsylvania prior to 1986. Harden admitted that when they adopted Eric, he and his wife agreed that she would be a full-time housewife and mother to Erie. He said they planned that she would go back to work, but he did not specify any time for her return to the work force.
Mr. Harden claimed that his drinking problem began after his wife’s death. He said he lost his faith in God. He did not seek medical or psychological treatment until four years after her death, when his attorney referred him to Dr. Beverly Howze. He saw Dr. Howze once and did not return for over a year. He admitted that he was eligible for free medical and psychiatric care at the Veterans Administration Hospital, but refused care claiming that “when you go to V.A., they talk to you like you’re some kind of crazy person. I couldn’t deal with it. |9That’s why I didn’t go back to no doctors.” He admitted that Dr. Howze suggested hospitalization at the V.A. hospital, which he refused.
He testified that when he surrendered Eric, he told him that he was taking him somewhere where somebody could look after him, and denied having told him he would never see him again. He testified that he didn’t date because of his grief, but admitted on cross-examination that he did “see someone” now and then and lived with June Moore for a couple of years after his wife’s death.
The evidence shows that Robert Harden’s psychological problems at least in part predated his wife’s death. From the time he was a small boy, he worked odd jobs and gave the money to his mother to help support the family. When he was nine years old, his father deserted the family. According to psychological evaluations contained in the record, Mr. Harden’s mother did not provide much attention or affection to her children. He was a very lonely child from a very early age.
The evidence is uncontroverted that Eric lost the only mother he had ever known, and his subsequent abandonment by Mr. Harden exacerbated that loss. In the normal course of life, he would have had the advantage of a loving, nurturing mother and a stable family had the defendants’ malpractice not removed Mrs. Harden from that family. The evidence preponderates that Eric will need counseling into the future to deal with the effects of Mrs. Harden’s death. In Ly v. State through Dept. of Public Safety and Corrections, 92-1054 (La.App. 1st Cir. 11/24/93) 633 So.2d 197, writ denied 93-3134 (La. 2/25/94), 634 So.2d 835, the court affirmed awards of $300,000 to each minor child for the loss of their mother and $225,000 for the loss of their father. Eric, like the Ly children, is a young child, in much need of a mother’s care. Unlike the Lys, however, his lipmedical condition, his adoptive status, and the lack of a supportive father exacerbates his loss. An appropriate award of damages to Eric is $500,000.
I am mindful that the trier of fact’s discretion is great, even vast, in fashioning an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied — U.S.-, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In the instant case, the jury heard only Mr. Harden’s story of his family life prior to his wife’s death. Eric Harden’s testimony and the expert testimony offered during the judge trial of Eric’s claim were not available to the jury when it made its determination of the quality of Mr. Harden’s family life and of his position in the family. A meticulous review of the entire record convinces me that the jury’s award is manifestly erroneous, and not supported by the record. The initial inquiry is whether the award for the particular loss and its effects under the particular circumstances on Mr. Harden, in particular, is a clear abuse of the “vast discretion” of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d *457 278 (La.1974); Spillers v. Montgomery Ward & Co. Inc., 294 So.2d 803 (La.1974); Youn v. Maritime Overseas Corp., supra. The award of $415,000 for loss of love, affection, consortium and services exceeds by approximately a third the HIGHEST of awards granted to surviving spouses. In Reid v. State through Dept. of Transp. and Development, 25,778 (La.App. 2 Cir. 5/4/94), 637 So.2d 618, 628, writ denied 94-1415 (La. 9/16/94), 642 So.2d 198, the court surveyed high | urange awards for loss of consortium. These recoveries ranged from $300,000 to $350,000. The mass of general damage awards for loss of consortium at the death of a spouse ranged from $7500 to $200,000, with $100,000 being the most frequent award. Reid, 637 So.2d at 627, citing Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986), writs denied 501 So.2d 213, 215 (1987). The record of the instant case does not justify a high range award. Mr. Harden was fifty-nine years old at the time of trial, and had the responsibility of rearing only one child, whom he abandoned to state custody. Mrs. Reid was awarded $300,000. Her psychiatrist described her as a young wife who suffered extreme grief at her loss of her “quite protective” husband and son in the accident upon which suit had been brought. In Smith v. Louisiana Health and Human Resources Administration, 93-1434 (La.App. 4 Cir. 5/18/94), 637 So.2d 1177, this court upheld an award of $325,000 in general damages to a young widow and mother of seven children, one of whom was mentally disabled. Clearly, then, this is the “high range” applicable to those surviving spouses who, by reason of their youth, dependence upon the decedent, quality of family life and burden of emotional support arising from parental responsibilities, have suffered the greatest consortium losses. In another recent case, the court reduced a spouse’s loss of consortium award from $247,815 to $150,000. Sledge v. Continental Cos. Co., 25,770 (La.App. 2 Cir. 6/24/94), 639 So.2d 805, 817. This is the highest award I would find justified by the record of the instant case.
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that | ^emerges from Gas-pard through Coco and Reck v. Stevens, 373 So.2d 498 (La.1979) to Youn is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., supra.
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury , that it “shocks the conscience.” Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991).
The award to Mr. Harden is obviously the result of passion or prejudice, shocks the conscience and does not bear a reasonable relationship to the elements of the proved damages. The entirety of the evidence, viewed in the light most favorable to the prevailing party in the trial court, indicates that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge and that this is one of those “exceptional cases where such awards are so gross as to be contrary to right reason.” Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir. (La.) 1987); Youn v. Maritime Overseas Corp., 623 So.2d at 1261.
The jurisprudence reflects that an award of $150,000 is the highest award that would adequately compensate Mr. Harden for his loss of love and affection, society, consortium and services and enjoyment of life.
_JjjBased upon a total award to both plaintiffs of $650,000, Mr. Harden’s apportionment is 23% and Erie Harden’s apportionment is 77%. Applying these proportions to the $100,000 on deposit in the registry of the *458 trial court and to the Fund’s $400,000 statutory liability, I would divide the total $500,-000 as follows: to Eric Harden the sum of $385,000.00, with legal interest from submission of the claim to the Fund Board; and to Robert Harden the sum of $115,000, with legal interest from submission of the claim to the Fund Board, subject to the intervention of counsel for attorneys’ fees to be determined by the trial court on remand.

. According to the public record of the Criminal District Court for the Parish of Orleans, on 27 September 1991 a Bill of Information charged that from 1 July 1990 through 31 August 1990, in the Parish of Orleans, Mr. Harden "committed aggravated crime against nature upon ERIC HARDEN age SIX (6) years old, by placing his penis in the mouth of ERIC HARDEN.” On 30 April 1992, Mr. Harden pleaded guilty to the reduced charge of contributing to the delinquency of a juvenile, Eric Harden, age six (6) years old (excluding subsection (A)(7) under 14:92).

. According to Dr. Kidder, this degree of disparity between performance and verbal scores is an indicator of mental disturbance.

. The jury was unaware of the testimony in Eric’s case that Mr. Harden surrendered Eric to State custody, and that upon the surrender, he denied that his wife had any living relatives who might have been a resource for Eric.