663 So.2d 443 (1995)
STATE of Louisiana Through the DEPARTMENT OF SOCIAL SERVICES on Behalf of the Minor Child, Eric HARDEN
v.
SOUTHERN BAPTIST HOSPITAL.
Robert A. HARDEN
v.
SOUTHERN BAPTIST HOSPITAL, et al.
Nos. 94-CA-2228, 94-CA-2229.
Court of Appeal of Louisiana, Fourth Circuit.
October 12, 1995.
Writ Denied January 26, 1996.
*446 Robert A. Caplan, Lewis & Caplan, New Orleans and Evan F. Trestman, New Orleans, for Plaintiff/Appellant.
C. William Bradley, Jr., Richard E. Gruner, Jr., Lemle & Kelleher, New Orleans, for Defendant/Appellant.
Leonard H. Rubenstein, New Orleans, and Richard A. Thompson, Deborah E. Lavender, New Orleans, for Appellee.
Before PLOTKIN, JONES, WALTZER, LANDRIEU and MURRAY, JJ.
PLOTKIN, Judge.
In this appeal of a medical malpractice case, this Court is asked to do three things: (1) determine the validity of a compromise agreement involving a minor, (2) decide the proper award of damages for two different claimants, and (3) apportion a limited fund between those two claimants.

I. Facts

These consolidated wrongful death and survival actions arose out of the May 11, 1988 death of Mary Silvia Harden at Southern Baptist Hospital as a result of an undetected, untreated ruptured spleen. On August 28, 1991, the State of Louisiana, through the Department of Social Services, on behalf of Mrs. Harden's adoptive son, plaintiff Eric Harden, filed suit against Southern Baptist. Two days later, Mrs. Harden's husband, plaintiff Robert Harden, filed a similar suit against Southern Baptist, Rodger Pielet M.D., and the Louisiana Patient's Compensation Fund (LPCF).
The claims were presented to a medical review panel, which found evidence of malpractice on the part of Southern Baptist. Southern Baptist admitted liability for Mrs. Harden's death, and deposited $100,000 into the registry of the court; that sum represents the limits of liability for a health care provider under the provisions of LSA-R.S. 40:1299.42(B)(2).
The two consolidated cases were tried separately in February 1994. Eric Harden's case was decided by the trial judge, while Mr. Harden's case was decided by a jury. Since liability had been previously admitted by the health care provider, the only issue at trial was the amount of damages. The only defendant was LPCF, whose liability is limited to $400,000 under the provisions of LSA-R.S. 40:1299.42(B)(1).
The jury awarded Mr. Harden a total of $1,015,703.05, itemized as follows:

Mrs. Harden's pain and suffering 0.00
Loss of love and affection, society,
 consortium, services and enjoyment
 of life 415,000.00
Past loss of earnings and/or impairment
 of earning capacity 38,875.00
Future loss of earnings and impairment
 of earning capacity 55,000.00
Mrs. Harden's loss of past and future
 earning capacity 270,000.00
Stipulated funeral expenses 3,828.05
Past and future mental anguish 150,000.00
Past and future psychological or
 medical treatment 83,000.00

Thereafter, the trial judge struck the $83,000 jury award for past and future psychological or medical treatment of Mr. Harden, then entered an amended judgment awarding Eric Harden $160,000, and awarding Mr. Harden $240,000 of the $400,000 limited fund owed by the LPCF.[1] Further, the trial court *447 judgment apportioned the $100,000 deposited into the registry of the court by Southern Baptist, awarding $40,000 to Eric Harden and $60,000 to Mr. Harden.
The LPCF suspensively appealed the amended judgment on July 22, 1994, while Mr. Harden devolutively appealed the amended judgment on August 8, 1994. On December 12, 1994, Eric Harden answered the appeals, seeking an increase in his award.
While the judgment was on appeal, prior to the hearing of the appeal, the LPCF entered into a compromise agreement with Venus Hall Moore, tutrix on behalf of the minor claimant, Eric Harden, whose name had by that time been changed to Eric Albert Hall Moore when he was adopted by Ms. Moore. On August 17, 1994, the trial court approved that compromise agreement, pursuant to the La.C.C.P. art. 4265 requirement that compromise agreements impacting the rights of minors be approved by a court. Thereafter, pursuant to the terms of the compromise agreement, the LPCF paid Eric Harden $160,000, the exact amount awarded Eric Harden by the trial court judgment. The LPCF then filed a motion to dismiss the portion of its suspensive appeal relative to the award to Eric Harden.
On appeal, the LPCF challenges the award to Mr. Harden, claiming that the award was excessive for three reasons: (1) it improperly awarded past and future lost wages, (2) it improperly awarded Mrs. Harden's past and future earning capacity, and (3) it improperly included duplicative awards for "loss of love and affection, society, consortium and service and enjoyment of life" and for "past and future mental anguish."
Mr. Harden's devolutive appeal challenges the validity of the compromise agreement between the LPCF and Eric Harden, as well as the apportionment of the limited fund between the two claimants. Additionally, Mr. Harden contests the trial court's striking of the jury's award for future medical and psychological care, and the trial court's failure to award legal interest on the entire $500,000 award.
In his answer to the appeals, Eric Harden claims that, if the compromise agreement is invalid, he is entitled to an increase in his award.
We will consider the two legal issues raised by Mr. Harden's appeal prior to considering the quantum of the award to Mr. Harden.

II. Validity of the compromise agreement

When the trial court signed the order authorizing Ms. Moore to compromise Eric Harden's claim against the LPCF, it specifically noted as follows:
following the satisfaction of the judgment in favor of Venus Moore, there remains only the present value sum of $240,000 [together with interest] out of the Louisiana Patient's Compensation Fund's $400,000.00 limitation of liability with which to satisfy that portion of the judgment in favor of plaintiff Robert A. Harden pending appeal.
Mr. Harden claims that the compromise agreement between the LPCF and Eric Harden is invalid because the trial court was without jurisdiction to approve the compromise. Further, Mr. Harden claims that the compromise improperly prejudiced his rights because it was rendered without notice to him and without giving him an opportunity to be heard. Mr. Harden also claims that LPCF's liability may exceed the $400,000 cap because of its action in compromising Eric Harden's claim.

A. Jurisdiction of the trial court

La.C.C.P. art. 2088, relative to the jurisdiction of the trial court in a case on appeal, provides, in pertinent part, as follows:
The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and timely filing of the appeal bond, in the case of a suspensive appeal or on the granting of the order of appeal, in the case of devolutive appeal. Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal, including the right to....
*448 (Emphasis added.) The above language is followed by a list of ten specific actions over which a trial court retains jurisdiction in a case even after the filing of an order of appeal. Compromise of a case or recognition of a compromise agreement is not specifically listed. Thus, Mr. Harden argues, the trial court had no authority to recognize the compromise agreement, making its order recognizing the compromise agreement an absolute nullity.
We disagree. Compromise agreements are strongly favored in Louisiana law. Walton v. Walton, 597 So.2d 479, 484 (La. App. 1st Cir.1992). That policy was explained in Walton as follows:
Compromise agreements between parties to avoid litigation are favored by law, and courts will not declare a settlement void without a clear showing that it violates good morals or public interest. Compromise settlements are not invalidated lightly in absence of bad faith, error or fraud.
Id. at 484. No allegations of bad faith, error, or fraud are made in the instant case, and no evidence of any of those circumstances exists.
Compromise agreements are defined and controlled by the provisions of La.C.C. art. 3071, which provides as follows:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be either reduced into writing or recited in open court and capable to being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.
(Emphasis added.) The only logical conclusion to be drawn from the boldfaced language in the above article is that a compromise agreement should be confected in the trial court. The obvious intent of the article is that parties to a judicial proceeding who choose to compromise their differences should be allowed to make a record of that compromise. Certainly, the article does not contemplate that a compromise agreement could be recited in open court or transcribed from the record in an appellate court. Generally, appellate courts are not the proper place for compromise agreements to be perfected. Appellate courts do not perform those types of functionary duties; such duties rest within the particular province of trial courts, which are capable of recording the compromise.
Realistically, however, neither a trial court nor an appellate court is typically involved in a compromise agreement; therefore, no Louisiana cases have determined whether the provisions of La.C.C.P. art. 2088 operate to divest a trial court of jurisdiction to approve or recognize a compromise agreement after an order of appeal is signed. However, the case law is clear that the trial court's jurisdiction is divested by the provisions of La.C.C.P. art. 2088 only regarding those matters that are "reviewable on appeal," meaning that the trial court's jurisdiction generally continues in all matters except those falling into that category. In the instant case, the judgment appealed does not mention the compromise and therefore the compromise is not "reviewable on appeal."
Moreover, the caselaw is clear that the list of circumstances over which the trial court retains jurisdiction enumerated in La. C.C.P. art. 2088 is not intended to be exclusive. See Valet v. City of Hammond, 577 So.2d 155, 162 (La.App. 1st Cir.1991). Under the express provisions of the article, the trial court is not considered divested of jurisdiction to consider any issue that is "not reviewable on appeal." This language, "not reviewable under the appeal," has generally been interpreted to give the trial court continuing jurisdiction over all issues that are "unaffected by the appeal," even if the issue is not specifically listed in La.C.C.P. art. 2088. Halley v. Guerriero, 577 So.2d 781, 783 (La.App.2d Cir.1991); see also Byles Welding & Tractor Co. v. Butts Sales & Service, Inc., 578 So.2d 246, 248 (La.App. 3d *449 Cir.1991). Thus, Mr. Harden's argument is invalid.
We recognize that the situation faced by the trial court and the parties in the instant case is unusual. Typically, compromise of a claim following the trial court's entry of a judgment, even while the judgment is on appeal, is perfected without any involvement by the trial or appellate courts. The parties simply negotiate a mutually-satisfactory compromise and file a joint motion to dismiss the appeal, which is routinely signed. The trial court's involvement in the instant case was necessitated only by the fact that the compromise involved the rights of a minor; La. C.C.P. art. 4265 requires trial court approval prior to compromise of an action involving a minor. Because the compromise basically amounted to satisfaction of the trial court's judgment against the LPCF in favor of the minor, the trial court approved the compromise.
Additionally, Mr. Harden's appeal was devolutive, not suspensive. Thus, the appeal filed by Mr. Harden did not suspend the effect of the judgment, meaning that, in the absence of the suspensive appeal filed by the LPCF, the LPCF would have been required to satisfy the judgment in favor of both Mr. Harden and Ms. Moore. Because Mr. Harden's appeal does not prevent the LPCF from satisfying the judgment in favor of either of the claimants, Mr. Harden has no right to complain of the satisfaction of the judgment in favor of either claimant. questionably, the effect of the compromise agreement between Ms. Moore and the LPCF was to satisfy the judgment in Ms. Moore's favor. Only the LPCF filed a suspensive appeal; thus, only the LPCF has the right to complain on appeal concerning any satisfaction of the judgment. Because the LPCF specifically moved the court to dismiss its suspensive appeal against one of the claimants, the trial court's order recognizing the judgment was signed on the express request of the only party that has preserved its right to complain.
In addition to the fact that both the language of La.C.C.P. art. 2088 and the jurisprudence interpreting that article indicate that the trial court was not divested of jurisdiction to approve the compromise in the instant case, good policy reasons exist for allowing the trial court, rather than an appellate court, to approve the compromise, even if the judgment has been appealed. The trial court has heard all the evidence in the case and is familiar with the action, making it far better equipped to determine whether the compromise is in the best interests of the minor.
Further, La.C.C. art. 3077 provides generally that a transaction or compromise agreement "can not be opposed by an interested party who was not a party to the agreement." In the instant case, Mr. Harden attempts to attack collaterally a compromise agreement to which he was not a party, an action clearly prohibited by the express provisions of the Louisiana Civil Code. For that reason also, Mr. Harden's argument may not prevail. We find that the compromise agreement between the LPCF and Eric Harden is valid.[2]

B. Prejudice of Mr. Harden's rights

In brief, Mr. Harden argues that some special rule regarding compromise should be applied in the instant case based on the fact that the defendant's liability is limited to $400,000, a sum much smaller than the damages suffered by the two claimants. Because of the limited liability imposed by *450 Louisiana's Medical Malpractice statutes, Mr. Harden claims that the compromise agreement somehow prejudiced his right to recovery. Although the logic of Mr. Harden's argument is obvious, this court cannot create a rule of law which simply does not exist. The fact that only a limited amount of funds are available to compensate all the victims of the medical malpractice cannot serve as authority to prevent the defendant from settling the suit brought by one of the claimants. Moreover, as discussed more fully below, Mr. Harden was not prejudiced by the compromise because the trial court's apportionment of the limited funds was not manifestly erroneous and thus is not subject to modification on appeal. Accordingly, we find no merit in this argument.

C. Extension of LPCF's liability

Mr. Harden also claims that the LPCF's funds total liability should exceed $400,000 under the circumstances of the instant case because the limitation applies only to amounts for which the LPCF is "cast in judgment." However, LSA-R.S. 40:1299(42)(B)(1) provides specifically as follows:
The total amount recoverable for all malpractice claims for injuries to or death of a patient ... shall not exceed five hundred thousand dollars plus interest and cost.
Thus, we find no merit in Mr. Harden's argument on this issue.

III. Apportionment of the fund

Although this issue is technically made moot by the fact that the compromise agreement between the LPCF and Eric Harden is valid, we will briefly address Mr. Harden's argument that the trial court improperly apportioned the limited fund in order to show the fallacies in Mr. Harden's argument that the compromise agreement prejudiced his rights. Mr. Harden claims that he should have received 82.3 percent of the total $500,000 award and that Eric Harden should have received only 17.63 percent. In order to reach these figures, Mr. Harden assumes that the trial judge found that Eric Harden suffered only the $200,000 in damages which the trial court actually awarded him from the $500,000 limited fund. Mr. Harden reaches those percentages by comparing his $934,243.05[3] jury award with Eric Harden's $200,000 award.
However, a close review of the record reveals that Mr. Harden's argument is misplaced. As previously stated, the jury awarded Mr. Harden itemized damages totalling $1,015,703.05. The trial court originally issued judgment in favor of Mr. Harden "in the full and true sum of $1,015,703.05," which it later reduced by striking the $83,000 award for past and future psychological or medical treatment. The trial judge then issued an amended judgment in which it reduced Mr. Harden's damages to $300,000 and awarded Eric Harden $200,000 in damages. The only logical interpretation of the trial court's actions in issuing the amended judgment is that she compared the damages suffered by the two claimants, determined that Mr. Harden suffered 60 percent of the total damages and that Eric Harden suffered 40 percent of the total damages, then entered judgment in accordance with those percentages.
Mr. Harden's assumption that the trial court found that Eric Harden's total damages were $200,000 is simply not supported by the record. There is no indication that the trial judge reduced Mr. Harden's damages, but awarded Eric Harden the full amount of damages suffered. The evidence indicates instead that the trial judge found Eric Harden's total damages to be hundreds of thousands of dollars, then compared his total damages to Mr. Harden's total damages to get a percentage for apportioning the limited fund. The trial judge obviously reduced the total damages due both claimants to accommodate the limited fund. Nothing in Louisiana statutory or case law requires the trial judge to enumerate a claimant's total damages prior to reducing those damages. Because the amount the trial court awarded Eric Harden is consistent with the percentage of damages suffered by Eric Harden, the *451 compromise agreement did not prejudice Mr. Harden's rights.

IV. Mr. Harden's damages

On appeal, the LPCF seeks modification of the award to Mr. Harden, claiming that it was excessive in a number of respects, and seeking reduction of the $300,000 total award to Mr. Harden.

A. Mr. Harden's past and future lost wages

First, the LPCF claims that the trial court improperly included an award for Mr. Harden's past and future lost wages caused by the death of his wife. We agree. Mr. Harden admitted at trial that the only thing preventing his return to gainful employment in the job he held prior to his wife's death is his alcoholism. Further, Mr. Harden admitted that he refused to participate in free counseling offered him by the State of Louisiana prior to his surrender of his adoptive son, Eric Harden. The record indicates that Mr. Harden also refused an offer of free medical intervention, including hospitalization, if necessary, at the Veterans Administration Hospital. Because Mr. Harden failed to mitigate his damages for lost past and future wages, we amend the judgment to delete the $38,875 for past loss of earning and impairment of earning capacity.

B. Mrs. Harden's lost past and future earning capacity

Second, the LPCF claims that the trial court improperly awarded Mrs. Harden's lost past and future earning capacity because the record contained no evidence that Mrs. Harden had ever worked in Louisiana or that she had ever intended to return to work in the future. Again, we agree. Mrs. Harden's employment as a computer operator ceased at or about the time she and Mr. Harden adopted Eric Harden. Subsequent to that time, approximately one year prior to her death, Mrs. Harden had obtained a certificate showing she had participated in training as a "medical assistant," but the evidence is uncontroverted that she never worked in that field. Mr. Harden admitted at trial that he and Mrs. Harden had agreed that she would not work, and that she would be a fulltime homemaker and mother to her adopted son. Mr. Harden said that they had intended that she would someday return to work, but gave no indication of when she might have done so, what job might have been available, or whether she would have engaged in full- or part-time employment. The record evidence is insufficient to support the $270,000 jury award for loss of past and future earning capacity; Mr. Harden's award is amended to delete this amount.

C. Duplication of damages

Third, the LPCF claims that the trial court improperly included duplicative awards for "loss of love and affection, society, consortium and service and enjoyment of life" and for "past and future mental anguish." Although this court held in Koepp v. Sea-Land Service, Inc., 93-2562 (La.App. 4th Cir. 11/17/94), 645 So.2d 1269 that damages for mental pain and suffering and damages for loss of enjoyment of life are duplicative, the awards made by the jury in the instant case are distinguishable from the awards made in the Koepp case. In this case, the two elements of damages are not duplicative.
The first item of damagesthe $415,000 awardis obviously a loss of consortium award, despite the fact the title given by the trial court contains the phrase "loss of enjoyment of life." The jury charges and the jury interrogatories both support this conclusion. No one has challenged the adequacy or accuracy of the jury charges, the jury interrogatories, or the classification of damages. The only issue raised by the LPCF is the argument that the use of the language "loss of enjoyment of life" in the loss of consortium element of damages makes that award duplicative of the award for past and future mental pain and suffering. The jury charge and interrogatories clearly indicate that the $415,000 award is for what is traditionally referred to only as loss of consortium.
Certainly, Mr. Harden is entitled to recover both loss of consortium and past and future mental pain and suffering. Accordingly, both the $415,000 award to Mr. Harden for "loss of love and affection, society, *452 consortium and service and enjoyment of life" and the $150,000 award for past and future mental pain and suffering are affirmed.

D. Past and future psychological or medical treatment

Mr. Harden claims that this court should increase the quantum of his award by reinstating the $83,000 award for his past and future psychological or medical treatment. In so arguing, Mr. Harden urges this court to extend the Medical Malpractice Act's exclusion of future medical expenses from the $500,000 cap to include medical or psychological expenses suffered by him as a third-party victim of the malpractice. In support of this claim, Mr. Harden points to the well-established principle that the Act is to be strictly construed in favor of tort claimants. Nonetheless, we disagree.
Both the language of the statute and the jurisprudence interpreting the statute have consistently held that the exclusion from the cap applies only to medical expenses incurred by the patient injured by the malpractice, not to third-party victims. See Hutchinson v. Patel, 93-2156 (La. 5/23/94), 637 So.2d 415. The case cited by Mr. Harden, A. Copeland Enterprises, Inc. v. Slidell Memorial Hospital, 93-0987 (La.App. 1st Cir. 4/8/94), 637 So.2d 1087, reversed, 94-2011 (La. 6/30/95), 657 So.2d 1292, does not support his position since it does not involve recovery of a third party's medical expenses. We find no merit in Mr. Harden's argument on this issue.

E. Legal interest

However, we do agree with Mr. Harden's argument that legal interest is due on the entire $500,000 judgment, including the $100,000 deposited by Southern Baptist Hospital into the registry of the court. Generally, the deposit of funds in the registry of the court stops the running of interest. See LaGraize v. Bickham, 391 So.2d 1185 (La. App. 4th Cir.1980). However, this rule must be modified by reference to two provisions of the Louisiana Medical Malpractice Act.
LSA-R.S. 40:1299.47 provides that legal interest shall accrue from the date of filing the complaint with the LPCF Oversight Board. LSA-R.S. 40:1299.42(B) provides that the $500,000 cap on medical malpractice recovery excludes interest and costs. Although no Louisiana case has addressed the reconciliation of these principles, the federal Fifth Circuit Court of Appeal in Castillo v. Montelepre, Inc., 999 F.2d 931 (5th Cir.1993) allowed recovery of interest on the entire $500,000 malpractice judgment although the plaintiff had settled his claim against the doctors for $100,000. We agree with the reasoning applied in that case and amend the judgment to include interest on the entire $500,000 award.
Accordingly, the original trial court judgment in favor of Mr. Harden is amended to delete both the $55,000 award for Mr. Harden's future loss of earning and impairment of earning capacity and the $270,000 award for Mrs. Harden's loss of past and future earning capacity. Mr. Harden's total award is therefore $568,828.05. However, because this amount far exceeds the $300,000 awarded to Mr. Harden in the amended judgment, the amended trial court judgment is affirmed, but amended to award interest from the date the complaint was filed with the LPCF Oversight Board and costs.

V. Conclusion

Accordingly, the amended trial court judgment is affirmed, and amended to award Mr. Harden legal interest on the entire $300,000 awarded to him, plus costs. In all other respects, the amended trial court judgment is affirmed.
AMENDED AND AFFIRMED.
WALTZER, J., concurs in part and dissents in part with reasons.
MURRAY, J., concurs.
WALTZER, Judge, concurring in part and dissenting in part with reasons.
I agree with the majority's modification of the award to Robert Harden excluding the award for Mr. Harden's past and future lost wages and earning capacity, and for Mrs. *453 Harden's lost past and future earning capacity. I agree that Mr. Harden failed to show that the trial judge made a mathematical error in computing his share of the award. I also concur in the rejection of Robert Harden's claims that the LPCF's total liability should exceed $400,000 because the limitation applies only to amounts for which the Fund is cast in judgment, and in the rejection of his claim for past and future psychological and/or medical treatment. I also concur with the majority's determination that legal interest is due on Mr. Harden's entire award from the date of filing the complaint with the LPCF Oversight Board. As to the remaining issues, I respectfully dissent.
THE FUND'S THIRD ASSIGNMENT OF ERROR: The jury's separate awards to Mr. Harden for "loss of love and affection, society, consortium and services and enjoyment of life" and for "past and future mental anguish" are duplicative, based on insufficient evidence and the jury was deprived of relevant, admissible evidence on this issue.
The award for "Loss of love and affection, society, consortium and services, and enjoyment of life" includes the "past and future mental anguish" suffered by Mr. Harden as a result of his wife's death. I would amend the judgment to delete the duplicative $150,000.00 award. See, Koepp v. Sea Land Service, Inc., 93-2562 (La.App. 4 Cir. 11/17/94), 645 So.2d 1269, 1278.
The evidence the Fund complains was not before the jury, testimony by Mrs. Harden's sisters generally relating to alleged incidents and conversations among the sisters having occurred over 20 years ago, was held by this Court to be irrelevant and inadmissible when it granted plaintiff's emergency application for supervisory relief. This issue having been litigated between the parties, this Court need not revisit the issue on appeal. The record shows that the Fund did not attempt to call the witnesses at trial, and has waived its objection.
ROBERT HARDEN'S FIRST ASSIGNMENT OF ERROR: The purported minor's settlement is null and of no effect.
Subsequent to the Fund's appeal (22 July 1994), and Mr. Harden's appeal (8 August 1994), on 17 August 1994 the Fund and Ms. Moore, on behalf of Eric, filed in Civil District Court a joint petition for authority to settle the minor's claim. While I recognize the desirability of amicable resolution of legal disputes, the trial court's order authorizing the minor's settlement is a nullity. The law is clear that the jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested on the granting of the order of appeal and the timely filing of the appeal bond for a suspensive appeal, or on the granting of the order of appeal in the case of a devolutive appeal. La.C.C.P. art. 2088. The minor's settlement is not one of the ten enumerated exceptions to this rule. Where, as here, there are competing claims to a limited fund, the approval of the minor's settlement is clearly a matter reviewable on appeal, since it impacts the errors raised by both Mr. Harden and Eric concerning the apportionment of the proceeds. The problem is compounded where, as here, the settlement was obtained ex parte and without prior notice to Mr. Harden. I believe that under the facts of this case, the trial court's order approving the minor's settlement is a nullity apparent from the face of the record and may be urged at any time and before any court in which the order is sought to be enforced. La.C.C.P. art. 2002(3); see, Zatzkis v. Zatzkis, 93-0366 (La.App. 4 Cir. 12/16/93), 629 So.2d 1285, 1287, writ denied 94-0159 (La. 6/24/94), 640 So.2d 1340. I would give no effect to this purported settlement.
ERIC HARDEN'S ANSWER TO APPEAL: The trial court abused its discretion in awarding a greater sum to the adult surviving spouse than to the minor of tender years.
The trial court made no finding as to the damages sustained by Eric Harden, merely apportioning the $500,000 statutory liability in the ratio of 60% to Mr. Harden and 40% to Eric. My independent review of the record convinces me that Eric Harden suffered and will continue to suffer damages far greater than those sustained by his former adoptive father.

*454 EVIDENCE CONCERNING ERIC HARDEN'S DAMAGES
Eric Harden was born to an unknown women and abandoned. At just over seven months of age, he was placed in the custody of Mary Sylvia Harden and Robert Harden, then residents of Pittsburgh. The Hardens adopted Eric in July, 1984, but never advised him that he was their adopted son. On 11 May 1988, Mary Harden died, and Eric remained in Robert Harden's custody until 17 August 1990, when Robert Harden voluntarily surrendered Eric to the custody of the State of Louisiana.
Joe Maggiore, MSW, handled the surrender on behalf of the state agency. He testified that Harden surrendered the child because as an admitted alcoholic he could not provide the supervision Eric required. Maggiore met Harden four times over a period of two weeks and offered Harden free counseling services to deal with his alcoholism and parenting concerns, but Harden refused the services. Maggiore went to Harden's home to pick up Eric, and testified that the conditions at Harden's home were so deficient that the child would have been removed from his custody, at least temporarily, even had Harden not surrendered Eric voluntarily. Maggiore described Harden's small apartment as being inadequately furnished, having broken windows and screen doors. Some of the apartments in his complex were boarded. In abandoning Eric to State custody, Mr. Harden denied the existence of his wife's surviving relatives, although in deposition he admitted that Eric's only relatives here were Mrs. Harden's family. Mr. Harden told the state agency that his own relatives, who lived in Pennsylvania, were unsuitable custodians, were either on welfare and food stamps, on drugs, or in jail. Mr. Harden admitted that he has not spoken to Eric since the surrender, and testified by deposition in November 1992 that he had no idea where Eric was.
In August, 1990, Eric was placed in foster care with the Walker family. Eric's hyperactivity, intermittent bedwetting and compulsive behavior of beating his head at night, together with poor integration into the Walker family, led the Walkers to return him to State custody in March, 1991. Mrs. Walker testified that when Eric arrived he refused to put his toys down, carrying them with him from room to room as if he were afraid that they would be taken away from him or he would lose them. The front of his forehead was pushed in and black from banging on the floor. Eric told her that he cried because no one loved him and because his father said at the surrender that he didn't ever want to see Eric for as long as he lived. Eric told Mrs. Walker that his father hated him, had told Eric that Eric was never going to amount to anything, and blamed Eric for his mother's death.
Eric's physician, Dr. Chakraborti, recommended that Eric be placed in Bethlehem Treatment Center, an institution where his medication could be regulated, and appropriate structure and counseling could be provided pending another foster or adoptive placement. The Bethlehem intake report shows a diagnosis of attention deficit hyperactive disorder, and adjustment disorder of childhood with mood disturbance. Eric adjusted well to life at Bethlehem, where he received intensive psychotherapy with therapist Lynn Charles. During the course of his treatment, Eric disclosed sexual abuse by Mr. Harden, beginning after Mrs. Harden's death.[1] While at Bethlehem, he developed a mutually caring relationship with Bethlehem nurse Venus Moore, in whose foster custody he was placed in December 1991. Ms. Moore formally adopted Eric in January 1994.
The testimony offered at trial proves that Eric had a very close relationship with Mrs. Harden, who was a caring, nurturing mother. At the age of 39, she voluntarily left the work force in order to devote herself to her newly adopted child. Eric's grief at her passing *455 was well established. He often asked to visit his mother, and took no joy in activities he had earlier pursued with her, such as visits to the park. His adjustment was complicated by his medical problems and significantly by Mr. Harden's failure to explain the circumstances of Mrs. Harden's death, by blaming Eric for her death, and by the actions that formed the basis of Mr. Harden's guilty plea to the reduced charge of contributing to six-year-old Eric's delinquency. The failure of the Walker placement required further adjustment by Eric.
The evidence established that Eric was an "A" student while Mrs. Harden was alive, but that his school achievement and behavior deteriorated after her death. Dr. David Kidder, an expert in psychology, evaluated Eric at Bethlehem. He identified Eric as at least average in intelligence (130 performance I.Q. and a 72 verbal IQ)[2], with the potential of high average to superior intelligence, but showing distinct signs of anxiety, restlessness, impulsive response, dependence upon fantasy for gratification, preoccupation and unresolved grief regarding the death of his mother, hyperactivity, attention deficit problems, somatic complaints, indecisiveness, uncertainty and insecurity. Eric was not clinically depressed. Dr. Kidder found no evidence in the medical reports of fetal alcohol syndrome or alcohol abuse by Eric's biological mother. Dr. Kidder testified that his notes show Mr. Harden sexually abused Eric and testified, based upon his experience in treating sexually abused individuals, that such individuals in later life may encounter periods of memory loss, problems in sexual relationships, may become abusers themselves and may allow themselves to become sexually abused.
While he still takes the drug Ritalin to control hyperactivity, Eric's head banging, disruptive behavior and bedwetting have ceased. Maggiore described Eric as one of his agency's success stories, success which Maggiore attributed to Bethlehem and to Ms. Moore's "good, stable, healthy, loving environment." Maggiore expected Eric to thrive as Ms. Moore's son.
Eric, who was ten years old at the time of trial, testified that his mother told him stories, sang lullabies and tucked him into bed. He testified that after Mrs. Harden's death, Mr. Harden abused him by telling him "to do disgusting stuff." He testified that Mr. Harden took him to visit his "Aunt Sis", where he would sometimes spend the night.

EVIDENCE CONCERNING ROBERT HARDEN'S DAMAGES
The jury heard testimony concerning only Robert Harden's wrongful death claim. He testified that he was born on 29 July 1935. He married Mary Sylvia Harden on 31 March 1958, five years into his twenty-three year career as an investigative military police officer. Mrs. Harden was 18 or 19 when they married. Mr. Harden described a traditional household. He separated from active duty in 1976 and returned with his wife to his hometown, Harrisburg, Pennsylvania where he worked as a security guard for Pinkerton's Detective Agency. He testified that although he and his wife wanted to have children, he was unable to father a child. In 1984, the Hardens adopted Eric, and in the adoption questionnaire described their marriage as a good one, based on love, trust, faith, and mutual respect. In 1986 or 1987, the Hardens moved to New Orleans, where Mrs. Harden's family lived.[3] Mr. Harden worked for Pinkerton's as an investigator, and at the time of Mrs. Harden's death, he worked as a deputy Orleans Parish Criminal Sheriff. He testified that after her death, he quit working, allegedly to take care of Eric. He testified that after he surrendered Eric to State custody, he "was still going to pieces" and couldn't work. On cross examination, he was confronted with his deposition testimony that there was no reason why he couldn't have gone back to work as a deputy sheriff after his wife's death.
Harden testified that in 1987 Mrs. Harden went to school and received a Medical Assistant's *456 certificate. Mrs. Harden never worked as a medical assistant, and never worked while in New Orleans. Her last employment was as a computer operator in Pennsylvania prior to 1986. Harden admitted that when they adopted Eric, he and his wife agreed that she would be a full-time housewife and mother to Eric. He said they planned that she would go back to work, but he did not specify any time for her return to the work force.
Mr. Harden claimed that his drinking problem began after his wife's death. He said he lost his faith in God. He did not seek medical or psychological treatment until four years after her death, when his attorney referred him to Dr. Beverly Howze. He saw Dr. Howze once and did not return for over a year. He admitted that he was eligible for free medical and psychiatric care at the Veterans Administration Hospital, but refused care claiming that "when you go to V.A., they talk to you like you're some kind of crazy person. I couldn't deal with it. That's why I didn't go back to no doctors." He admitted that Dr. Howze suggested hospitalization at the V.A. hospital, which he refused.
He testified that when he surrendered Eric, he told him that he was taking him somewhere where somebody could look after him, and denied having told him he would never see him again. He testified that he didn't date because of his grief, but admitted on cross-examination that he did "see someone" now and then and lived with June Moore for a couple of years after his wife's death.
The evidence shows that Robert Harden's psychological problems at least in part predated his wife's death. From the time he was a small boy, he worked odd jobs and gave the money to his mother to help support the family. When he was nine years old, his father deserted the family. According to psychological evaluations contained in the record, Mr. Harden's mother did not provide much attention or affection to her children. He was a very lonely child from a very early age.
The evidence is uncontroverted that Eric lost the only mother he had ever known, and his subsequent abandonment by Mr. Harden exacerbated that loss. In the normal course of life, he would have had the advantage of a loving, nurturing mother and a stable family had the defendants' malpractice not removed Mrs. Harden from that family. The evidence preponderates that Eric will need counseling into the future to deal with the effects of Mrs. Harden's death. In Ly v. State through Dept. of Public Safety and Corrections, 92-1054 (La.App. 1st Cir. 11/24/93) 633 So.2d 197, writ denied 93-3134 (La. 2/25/94), 634 So.2d 835, the court affirmed awards of $300,000 to each minor child for the loss of their mother and $225,000 for the loss of their father. Eric, like the Ly children, is a young child, in much need of a mother's care. Unlike the Lys, however, his medical condition, his adoptive status, and the lack of a supportive father exacerbates his loss. An appropriate award of damages to Eric is $500,000.
I am mindful that the trier of fact's discretion is great, even vast, in fashioning an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In the instant case, the jury heard only Mr. Harden's story of his family life prior to his wife's death. Eric Harden's testimony and the expert testimony offered during the judge trial of Eric's claim were not available to the jury when it made its determination of the quality of Mr. Harden's family life and of his position in the family. A meticulous review of the entire record convinces me that the jury's award is manifestly erroneous, and not supported by the record. The initial inquiry is whether the award for the particular loss and its effects under the particular circumstances on Mr. Harden, in particular, is a clear abuse of the "vast discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d *457 278 (La.1974); Spillers v. Montgomery Ward & Co. Inc., 294 So.2d 803 (La.1974); Youn v. Maritime Overseas Corp., supra. The award of $415,000 for loss of love, affection, consortium and services exceeds by approximately a third the HIGHEST of awards granted to surviving spouses. In Reid v. State through Dept. of Transp. and Development, 25,778 (La.App. 2 Cir. 5/4/94), 637 So.2d 618, 628, writ denied 94-1415 (La. 9/16/94), 642 So.2d 198, the court surveyed high range awards for loss of consortium. These recoveries ranged from $300,000 to $350,000. The mass of general damage awards for loss of consortium at the death of a spouse ranged from $7500 to $200,000, with $100,000 being the most frequent award. Reid, 637 So.2d at 627, citing Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986), writs denied 501 So.2d 213, 215 (1987). The record of the instant case does not justify a high range award. Mr. Harden was fifty-nine years old at the time of trial, and had the responsibility of rearing only one child, whom he abandoned to state custody. Mrs. Reid was awarded $300,000. Her psychiatrist described her as a young wife who suffered extreme grief at her loss of her "quite protective" husband and son in the accident upon which suit had been brought. In Smith v. Louisiana Health and Human Resources Administration, 93-1434 (La.App. 4 Cir. 5/18/94), 637 So.2d 1177, this court upheld an award of $325,000 in general damages to a young widow and mother of seven children, one of whom was mentally disabled. Clearly, then, this is the "high range" applicable to those surviving spouses who, by reason of their youth, dependence upon the decedent, quality of family life and burden of emotional support arising from parental responsibilities, have suffered the greatest consortium losses. In another recent case, the court reduced a spouse's loss of consortium award from $247,815 to $150,000. Sledge v. Continental Cas. Co., 25,770 (La.App. 2 Cir. 6/24/94), 639 So.2d 805, 817. This is the highest award I would find justified by the record of the instant case.
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard through Coco and Reck v. Stevens, 373 So.2d 498 (La.1979) to Youn is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., supra.
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991).
The award to Mr. Harden is obviously the result of passion or prejudice, shocks the conscience and does not bear a reasonable relationship to the elements of the proved damages. The entirety of the evidence, viewed in the light most favorable to the prevailing party in the trial court, indicates that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge and that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir. (La.) 1987); Youn v. Maritime Overseas Corp., 623 So.2d at 1261.
The jurisprudence reflects that an award of $150,000 is the highest award that would adequately compensate Mr. Harden for his loss of love and affection, society, consortium and services and enjoyment of life.
Based upon a total award to both plaintiffs of $650,000, Mr. Harden's apportionment is 23% and Eric Harden's apportionment is 77%. Applying these proportions to the $100,000 on deposit in the registry of the *458 trial court and to the Fund's $400,000 statutory liability, I would divide the total $500,000 as follows: to Eric Harden the sum of $385,000.00, with legal interest from submission of the claim to the Fund Board; and to Robert Harden the sum of $115,000, with legal interest from submission of the claim to the Fund Board, subject to the intervention of counsel for attorneys' fees to be determined by the trial court on remand.
MURRAY, Judge, concurring.
I concur in the result.
NOTES
[1] The judgment also granted judgment in favor of intervenors for attorney fees in an amount to be fixed.
[2] As noted, this case involves a final, binding, court-approved compromise agreement between a minor and the only defendant. Neither the minor nor his tutrix has any remaining interest in the appeal. Nevertheless, the tutrix was allowed to file, on behalf of the minor, both an answer to the appeal and a brief in support of that answer, which should not have been allowed. Presumably, the tutrix was allowed to file the answer because of the issue raised by Mr. Harden's devolutive appeal concerning the validity of the compromise. If the compromise was invalid, the tutrix claims, this Court should consider whether the trial court abused its discretion by awarding a greater percentage of the recovery to Mr. Harden than to Eric. The tutrix fails to cite any authority for its implied argument that minors are more entitled to recover damages resulting from the death of their mothers than husbands are entitled to recover for damages resulting from the death of their wives. Because we have found that the compromise argument is valid, we pretermit further discussion of this issue.
[3] The calculations by which Mr. Harden reached this figure are unclear.
[1] According to the public record of the Criminal District Court for the Parish of Orleans, on 27 September 1991 a Bill of Information charged that from 1 July 1990 through 31 August 1990, in the Parish of Orleans, Mr. Harden "committed aggravated crime against nature upon ERIC HARDEN age SIX (6) years old, by placing his penis in the mouth of ERIC HARDEN." On 30 April 1992, Mr. Harden pleaded guilty to the reduced charge of contributing to the delinquency of a juvenile, Eric Harden, age six (6) years old (excluding subsection (A)(7) under 14:92).
[2] According to Dr. Kidder, this degree of disparity between performance and verbal scores is an indicator of mental disturbance.
[3] The jury was unaware of the testimony in Eric's case that Mr. Harden surrendered Eric to State custody, and that upon the surrender, he denied that his wife had any living relatives who might have been a resource for Eric.